**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

CHANEL GARCIA, ARGENIS BETANCO, LINPENG GAO, KEVIN DOYLE, NERYS RAMIREZ, JACK NAZAIRE, CARL DELOUIS, VICTOR GUZMAN, RICHARD DELAHANTY, KEVEN SANCHEZ, and DANNY QUINTANAL, on behalf of themselves and all others similarly situated,

Plaintiffs,

*-against-*

ROSSANA ROSADO, STEPHANIE RUSSELL, STEPHANIE HOFFMAN, KELLY CONLON, DAVID MAHANY, ADAM DEAN, MICHAEL BONSE, COLLEEN GLAVIN, and JENNIFER GRASSO,

Defendants.

**Case No. 1:26-cv-06715-JGK**

**FIRST AMENDED CLASS ACTION COMPLAINT**

**Jury Trial Demanded**

# TABLE OF CONTENTS

INTRODUCTION ....1

FACTUAL BACKGROUND ....3

I. The DCJS's Role in Certifying Police and Peace Officers ....3

II. The New York State Professional Policing Act of 2021 ....4

III. The DCJS's Minimum Hiring Standards for Municipal Police Officer Candidates ....4

IV. The DCJS's Decertification and Disqualification Scheme ....8

A. The Applicable Statutes ....8

B. The DCJS's Regulations in 9 NYCRR Part 6056....10

C. The DCJS's Established Policies, Procedures, and Practices ....16

THE PARTIES ....22

I. Defendants ....22

II. Plaintiffs ....24

JURISDICTION AND VENUE ....56

CLASS ACTION ALLEGATIONS ....57

CAUSES OF ACTION ....59

PRAYER FOR RELIEF ....63

## INTRODUCTION

1. Officials of the New York State Division of Criminal Justice Services ("DCJS") administer a patently unconstitutional scheme that deprives law enforcement officers of protected property and liberty interests without due process of law.

2. To prevent police and peace officers who are "bad actors" or have committed "serious misconduct" from continuing to serve, the New York Legislature enacted statutes that (a) require employers to notify the DCJS when a police or peace officer's separation from employment constituted a "removal for cause" ("RFC"); (b) provide that a police or peace officer's certification becomes "invalid" upon an employer's RFC report; and (c) authorize the DCJS to "permanently invalidate" a police officer's certification and permanently disqualify the officer from serving in the policing profession.

3. A DCJS regulation defines "removal for cause" to encompass an officer who was fired or resigned from employment "in connection with" an "allegation" that the officer committed "misconduct," which in turn is broadly defined to include conduct unrelated to an officer's fitness to serve. Indeed, the regulation defines "misconduct" so broadly and vaguely that the term reaches conduct that does not constitute "misconduct" as a matter of state law and even conduct that is protected by state law.

4. Upon an employer's submission of an RFC report, the DCJS categorically decertifies the subject police or peace officer and, if a police officer, also categorically bars the officer from future police certification. The DCJS treats those consequences as mandatory and imposes them without notice or an opportunity to be heard, even when the reported circumstances in no way indicate that the officer actually committed wrongdoing or is unfit to serve.

5. If and when the DCJS sends notice of decertification/disqualification, the officer is not informed of the underlying alleged "misconduct" or the ability to request review.

6. Post-deprivation review is meaningless when the circumstances reported by the former employer qualify as a "removal for cause." In that situation, the officer will remain decertified/disqualified even upon proving that the alleged misconduct never occurred or amounted to a technical infraction unrelated to fitness to serve.

7. In connection with those deprivations, the DCJS publicly designates officers as "removals for cause" and keeps them on this "Decertification List" for life. The designations falsely imply that officers who remain fully fit to serve are unfit and that they engaged in wrongdoing, even when the alleged "misconduct" never occurred or was protected by state law. The DCJS does not notify officers of their placement on the Decertification List, or provide them with a meaningful opportunity to rebut these implications and clear their names.

8. For those and numerous other due process violations, Plaintiffs bring this putative civil rights class action against the named DCJS officials on behalf of thousands of individuals who (a) have been or are at risk of being decertified as a police or peace officer, and (b) have been or are at risk of being permanently disqualified from serving as a police officer. Among other relief, Plaintiffs seek a declaration that the DCJS scheme violates due process, an order requiring Defendants to prevent and remedy the unconstitutional violations, and an award of compensatory and punitive damages as well as reasonable attorneys' fees.

## FACTUAL BACKGROUND[1]

## I. The DCJS's Role in Certifying Police and Peace Officers[2]

9. The New York Executive Law requires the DCJS to do the following:

> Certify police officers and peace officers who have satisfactorily completed basic training programs and issue certificates to such police officers and peace officers, including the issuance of equivalency certificates for basic training certificates issued to peace officers, where such officers received a certificate for successful completion of a basic training for police officers program or an approved course for state university of New York public safety officers during a period in which such peace officer was not employed as a police officer, upon demonstration of adequate equivalent training, the completion of supervised field training, requisite job-related law enforcement experience as determined by the [DCJS] commissioner, and if deemed necessary, the successful completion of relevant police officer training courses pursuant to [New York General Municipal Law ("GML") § 209-q].

Exec. Law § 841(3).

10. Section 209-q(1)(a) of the GML provides as follows:

> [N]o person shall … receive an original appointment on a permanent basis as a police officer of any county, city, town, village or police district unless such person has previously been awarded a certificate by the [DCJS's] municipal police training council [("MPTC")], … attesting to his satisfactory completion of an approved municipal police basic training program; and every person who is appointed … on other than a permanent basis as a police officer … shall forfeit his position as such unless he previously has satisfactorily completed, or within the time prescribed by [9 NYCRR § 6020.7], satisfactorily completes, a municipal police basic training program for temporary or probationary police officers and is awarded a certificate by [the MPTC] attesting thereto.

GML § 209-q(1)(a).

11. New York Criminal Procedure Law ("CPL") § 2.30(2) provides as follows:

[1] Unless otherwise indicated, all alterations, citations, ellipses, emphases, first-letter capitalizations, numberings, and quotation marks are omitted from sources referenced herein.

[2] A "*police officer* means a person designated as such in [CPL §] 1.20(34)," and a "*peace officer* means a person designated as such in [CPL §§] 2.10 and 2.16." 9 NYCRR (New York Codes, Rules and Regulations) § 6056.2(e)–(f).

> Each peace officer satisfactorily completing the [training] course prescribed by the [MPTC] shall be awarded a certificate by the [DCJS] attesting to that effect, and no person appointed as a peace officer shall exercise the powers of a peace officer, unless he or she has received such certification within twelve months of appointment.

CPL § 2.30(2).

## II. <u>The New York State Professional Policing Act of 2021</u>

12. The New York Legislature enacted the Professional Policing Act ("PPA") to "hold police officers who engage in serious misconduct accountable and prevent bad actors from serving as police officers." (Ex. A: DCJS's Notice of Adoption of Professional Policing Standards (Nov. 2, 2022) at 1; *see also* Ex. B: New York Governor's Press Release (Oct. 16, 2023) (noting that the PPA aims to ensure that police officers are "qualified, of good moral character and physically and psychologically fit to do the job")).

13. To advance those objectives, the PPA revised several statutes, including Executive Law §§ 840 and 845 as well as GML § 209-q. (Ex. C, PPA).

## III. <u>The DCJS's Minimum Hiring Standards for Municipal Police Officer Candidates</u>

14. As added by the PPA, Executive Law § 840(2-b) requires the MPTC to prescribe "regulations concerning background investigations for eligibility of persons for provisional or permanent appointment in the competitive class of the civil service as police officers of any county, city, town, village or police district as it deems necessary and proper for the efficient performance of police duties." Exec. Law § 840(2-b).

15. The PPA also amended § 840(2) to add psychological requirements for police officer eligibility. As amended, § 840(2) requires the MPTC to prescribe regulations establishing "height, weight, physical fitness and psychological requirements for eligibility of persons

[described in § 840(2-b)] as it deems necessary and proper for the efficient performance of police duties." Exec. Law § 840(2).

16. Pursuant to the PPA, the MPTC has prescribed regulations concerning "background investigations of all persons appointed to the position of police officer as designated in [CPL § 1.20(34)], where such department is required to be certified in accordance with [Executive Law § 846-h(1)(d)]."[3] 9 NYCRR § 6000.2(d). Thus, § 6000.2(c) provides as follows:

> All law enforcement officers must be of good moral character as determined by a thorough background investigation to ensure persons who engage in illegal, dishonest, unprofessional, unethical, or immoral conduct are prohibited from becoming police officers, and to protect against acts or conduct which may endanger the safety and welfare of the public.

9 NYCRR § 6000.2(c).

17. Section 6000.10 sets forth "the procedures and standards for background investigations to examine each [municipal police officer] candidate and allow such candidate to demonstrate on a case-by-case basis, the candidate's eligibility and ability to perform the essential job functions of a police officer."[4] *See* 9 NYCRR § 6000.2(d). In particular, § 6000.10 provides that "the appointing agency shall ensure a thorough investigation into the applicant's moral character is completed by an experienced investigator." 9 NYCRR § 6000.10(a). Section 6000.10(a)(1) provides that "an applicant is determined to lack good moral character, and be unfit

[3] Section 846-h(1)(d)'s "certification process" is mandated for agencies employing certain police officers, including sworn members of an "authorized police department or force of a city, town, village or police district." Exec. Law § 846-h(1)(d) (citing CPL § 1.20(34)).

[4] A police officer's "essential job functions/tasks" include: (a) "arrest and detention of suspects"/"advise persons of constitutional rights"); (b) "vehicle operations"/"engage in emergency driving in congested area"); and (c) "deadly force"/"discharge firearm at person." 9 NYCRR § 6000.9.

to serve as a police officer, if within three years from the date of application the applicant has engaged in:

i. Criminal activity, whether or not criminally charged or prosecuted, regardless of where the act took place if said conduct would constitute an offense in New York, which is defined as:

   1. Any felony offense

   2. Any sex offense or sexually violent offense as defined in article 6C of the Correction Law;

   3. All serious offenses defined in subdivision 17 of section 265 of the [New York] Penal Law;

   4. Crimes involving official misconduct and obstruction of public servants as defined in article 195 of the Penal Law; crimes involving bribery of a public servant as defined in article 200 of the Penal Law; crimes involving perjury as defined in article 210 of the Penal Law; crimes relating to judicial proceedings as defined in article 215 of the Penal Law;

   5. Crimes involving forgery as defined in article 170 of the Penal Law; crimes involving false written statements as defined in article 175 of the Penal Law; crimes involving fraud as defined in article 190 of the Penal Law; or

   6. Crimes involving assault and menacing as defined in article 120 of the Penal Law; crimes involving obscenity as defined in article 235 of the Penal Law; crimes against public sensibilities as defined in article 245 of the Penal Law.

ii. The unlawful use of any controlled substances as defined in article 220 of the Penal Law.[5]

iii. False statements or conduct that subverts or attempts to subvert the police employment application process.

iv. A dishonorable discharge from any of the Armed Forces of the United States.

---

[5] Article 220's definition of "controlled substance" does not include cannabis or cannabinoids. *See* Penal Law § 220.00(5); New York Public Health Law § 3306; New York Cannabis Law § 3(2).

9 NYCRR § 6000.10(a)(1). Section 6000.10 provides that the agency "may determine an applicant lacks good moral character and is unfit to serve as a police officer if the applicant has engaged in the following conduct which may be considered an indicator of a lack of good moral character:

> i. The unlawful use of any controlled substances, as defined in Article 220 of the Penal Law, more than three years from the date of application. The agency may consider the type of controlled substance used, the frequency of use and the age of the applicant at the time of use;
>
> ii. Inappropriate sexual conduct regardless of adjudication;
>
> iii. Conduct involving dishonesty, deceit, or misrepresentation;
>
> iv. Historical pattern of conduct of moving traffic violations;
>
> v. Any of the conduct listed in paragraph (1) of this section which has occurred more than three years from the date of application and the agency has determined that the conduct is an indicator that the applicant lacks good moral character; or
>
> vi. Any other conduct that the agency determines is a reflection on the applicant's moral character.

9 NYCRR § 6000.10(a)(2).[6] The investigator's "moral character findings … shall be presumed to be true unless the applicant presents evidence contradicting the findings and such evidence would

[6] The New York Marihuana Regulation and Taxation Act of 2021 ("MRTA") legalized marijuana for adult recreational use. *See* Penal Law § 222.05(1). Regarding whether an appointing agency may determine that marijuana use is a "reflection on the applicant's moral character," the DCJS has advised police employers to "consult with their local attorney for any labor law implications (see, Labor Law Section 201-d)." (Ex. D: DCJS's FAQs on Hiring Standards and Procedures for Police Officer Candidates – 9 NYCRR Part 6000 (Nov. 10, 2022) at 2).

As amended by the MRTA, § 201-d(2) generally makes it "unlawful for any employer or employment agency to refuse to hire, employ or license, or to discharge from employment or otherwise discriminate against an individual in compensation, promotion, or terms, conditions or privileges of employment because of … an individual's legal use of consumable products … [or] legal recreational activities, including cannabis in accordance with state law, outside work hours, off of the employer's premises and without use of the employer's equipment or other property." Lab. Law § 201-d(2)(b)–(c); *see also* Cannabis Law § 127(1), (5) (providing that "no person … shall be subject to … penalty in any manner, or denied any right or privilege[,] … solely for conduct permitted under this chapter, including … [Penal Law §] 222.05" (which is what legalized adult-use marijuana). One exception to § 201-d(2) is that an employer may take "employment

lead a reasonable person to conclude that the presumption is no longer valid." 9 NYCRR § 6000.10(e).

18. Additionally, Part 6000 provides that municipal police officer candidates generally must (a) have the "physiological capacity to learn and perform the essential job functions of a police officer"; (b) be "emotionally stable and psychologically fit to perform the essential functions of a police officer and endure the uniquely stressful working conditions"; and (c) be "physically able and psychologically fit … to perform the essential job functions of a police officer for the police agency seeking to employ the candidate." 9 NYCRR §§ 6000.2(b)–(c), 6000.3, 6000.8.[7]

## IV. <u>The DCJS's Decertification and Disqualification Scheme</u>

### A. The Applicable Statutes

19. Section 845(1) of the Executive Law requires the DCJS to "collect information to maintain, on a current basis, a registry of all police officers and peace officers in the state." Exec. Law § 845(1).

20. As added by the PPA, § 845(2)(b) provides that when a police or peace officer has "ceased to serve," the "head" of the officer's former employer "shall immediately" notify the DCJS whether the officer's separation from employment was "due to a leave of absence, resignation, removal, removal for cause, or removal during a probationary period." Exec. Law § 845(2)(b).

---

action against an employee if the employee is impaired by cannabis while working." New York Labor Department's Guidance on Adult Use Cannabis and the Workplace (Oct. 2021), https://dol.ny.gov/system/files/documents/2021/10/p420-cannabisfaq-10-08-21.pdf (last visited Nov. 2, 2026) at 1 (citing Lab. Law § 201-d(4-a)). A "test for cannabis usage cannot serve as a basis for an employer's conclusion that an employee was impaired by the use of cannabis, since such tests do not currently demonstrate impairment." *Id.* at 2.

[7] The psychological fitness language in §§ 6000.2(c) and 6000.3 was adopted pursuant to the PPA.

21. Section 845(4) provides that if an employer fails to comply with §845(2)(b)'s reporting requirement, the DCJS Commissioner may obtain from the New York Supreme Court "an order directed to the person responsible requiring compliance." Exec. Law § 845(4).

22. GML § 209-q(1)(b) provides that a police officer certificate (i.e., a certificate awarded under GML § 209-q(1)(a)) becomes "[in]valid" upon the officer's employment separation "by reason of such officer's … removal for cause." *See* GML § 209-q(1)(b), (c). Similarly, CPL § 2.30(6) provides that a peace officer certificate (i.e., a certificate awarded under CPL § 2.30(2)) becomes "[in]valid" upon the officer's employment separation "by reason of such officer's … removal for cause." CPL § 2.30(6).

23. As added by the PPA, Executive Law § 845(3)(b) requires the DCJS to "establish procedures, in accordance with the state administrative procedure act [("SAPA")], for [the following] process":

> When it shall appear to the [DCJS] commissioner or the commissioner's designee that a notification of the reason [a police or peace] officer ceased to serve, received by the commissioner pursuant to [§ 845(2)(b)] is inaccurate in a material respect, the commissioner shall attempt to resolve such discrepancy by contacting the head of the office that submitted such notification. If such informal efforts do not resolve the discrepancy promptly, the commissioner may issue a notice to such head and the officer who is the subject of such notification of an inquiry into the accuracy of such record. After notice and an opportunity for each to be heard, if the commissioner finds such record to be inaccurate with respect to such matter in a material respect, the commissioner shall provide notice of such determination to each of them and, pursuant to such determination, may correct such record.

Exec. Law § 845(3)(b).

24. As added by the PPA, § 209-q(1)(b-1) provides that (a) a police officer certificate "*may* be permanently invalidated upon an officer's removal for cause in accordance with

[Executive Law § 845(2)–(3)]"; and (b) an officer whose certificate is so invalidated "*may* be ineligible for any future certification." GML § 209-q(1)(b-1) (emphasis added). [8]

### B. The DCJS's Regulations in 9 NYCRR Part 6056[9]

25. To "implement[]" the PPA, the DCJS has adopted the regulations that are set forth in Part 6056. (Ex. A).

26. Section 6056.3 requires the DCJS to enter into the Central State Registry of Police Officers and Peace Officers "all information concerning police or peace officers required to be reported by employers by [Executive Law § 845] and in accordance with such rules and regulations as the [DCJS Commissioner] may adopt to ensure the accuracy of such information and integrity of the registry as a public record." 9 NYCRR § 6056.3(a).

27. 6056.4(d) provides as follows:

> Each employer[10] shall, … with respect to each police or peace officer employed by it, immediately notify the [DCJS] the effective date such officer ceases to serve and the reason for such, which shall include one of the following: (1) leave of absence; (2) resignation; (3) removal; (4) removal for cause as defined in 6056.2(h) … ; [or] (5) removal during a probationary period as defined in 6056.2(i)[.]

9 NYCRR § 6056.4(d).

28. Section 6056.2 defines the following two terms as follows:

- "*Removal for cause of a full-time or part-time police officer or peace officer* means when an officer has an interruption in service as defined in paragraph (2) of [subdivision (h)] subsequent to and in connection with allegations of misconduct as defined in paragraph (1) of [subdivision (h)] which are known or should have been known to the

---

[8] As used in this Complaint, a "decertification" refers to the revocation of a police/peace officer certificate and a "disqualification" refers to a police officer who has been rendered "ineligible for any future [police officer] certification."

[9] A copy of Part 6056 is attached as Exhibit E.

[10] In Part 6056, the term "employer" means the "chief executive officer" of an employer of police or peace officers. 9 NYCRR §6056.2(d).

employer or any officer or employee of the employer agency or is being investigated by another agency or entity." 9 NYCRR § 6056.2(h).

- "*Removal during a probationary period* means a probationary period not successfully completed due to conduct defined in paragraph (1) of subdivision (h)[.]" 9 NYCRR § 6056.2(i).

29. Paragraph (2) of § 6056.2(h) provides as follows:

Interruption from service includes separation:

(a) pursuant to:

i. a hearing held under section 75 of the Civil Service Law;

ii. a collective bargaining agreement, or any general, special or local law, or charter provision in accordance with section 76 of the Civil Service Law; or

iii. any other applicable law; or

(b) by an employee's resignation or retirement; or

(c) after an employee's waiver of any rights available pursuant to one of the processes described in subdivision (h)(2)(a) of this section.

9 NYCRR § 6056.2(h)(2).

30. Paragraph (1) of § 6056.2(h) provides as follows:

Misconduct, includes:

(a) Criminal activity, whether or not criminally charged or prosecuted, regardless of where the act took place if said conduct would constitute an offense in New York, which is defined as:

i. Any felony offense;

ii. Any sex offense or sexually violent offense as defined in article 6C of the Correction Law;

iii. All serious offenses as defined in subdivision 17 of section 265 of the Penal Law;

iv. Crimes involving official misconduct and obstruction of public servants as defined in article 195 of the Penal Law; crimes involving bribery of a public servant as defined in article 200 of the Penal Law; crimes involving perjury

as defined in article 210 of the Penal Law; offenses relating to judicial proceedings as defined in article 215 of the Penal Law;[11]

v. Crimes involving forgery as defined in article 170 of the Penal Law; crimes involving false written statements as defined in article 175 of the Penal Law; crimes involving fraud as defined in article 190 of the Penal Law; or

vi. Crimes involving assault and menacing as defined in article 120 of the Penal Law; crimes involving obscenity as defined in article 235 of the Penal Law; crimes against public sensibilities as defined in article 245 of the Penal Law.[12]

(b) Dishonesty which is defined as:

i. False statements or conduct that subverts or attempts to subvert the

*i.* Employment application process; or

*ii.* State certification process defined in [GML] § 209-q.

ii. Conduct involving dishonesty, fraud, deceit, or misrepresentation.[13]

(c) Use of Excessive Force which is defined as:

i. Force which violates the use of force policy required under Executive Law § 840(4)(d)(3);[14]

(d) Sexual Abuse which is defined as:

---

[11] Thus, "misconduct, includes," the non-criminal offense of failing to respond to an appearance ticket (Penal Law § 215.58).

[12] Thus, "misconduct" reaches the class B misdemeanors of Menacing in the Third Degree (Penal Law § 120.15) and Public Lewdness (Penal Law § 245.00).

[13] Thus, "misconduct" reaches an immaterial misrepresentation. Does "misconduct" also reach an honest misrepresentation?

[14] Section 840(4)(d)(3) requires employers of police/peace officers to "adopt and implement a use of force policy in the agency of which they are in charge." Exec. Law § 840(4)(d)(3). Thus, "misconduct" reaches a slight use of excessive force.

i. Inappropriate conduct of a sexual nature, civil or criminal, regardless of adjudication;[15]

ii. Engaging in sexual conduct while on duty;[16] or

iii. Engaging in sexual conduct with someone detained or in the custody or control or under the supervision of a police or peace officer.

(e) Gross Negligence which is defined as: acts where the police or peace officer's act or failure to act creates a danger or risk to persons, property, or to the efficient operation of the department, recognizable as a gross deviation from the standard of care that a reasonable police or peace officer would observe in a similar circumstance.

(f) Gross Misconduct: an act which a department determines does not comply with practices generally followed in the profession, current teaching at public safety training facilities, and technical reports and literature relevant to the field of law enforcement.[17]

9 NYCRR § 6056.2(h)(1).

31. Under § 6056.4(e), a police/peace officer certificate "shall immediately be deemed invalid when an officer ceases to serve [by reason of removal for cause as defined in § 6056.2(h)

---

[15] Does "misconduct" under § 6056.2(h)(1)(d)(i) encompass an off-duty sexual joke? Does the phrase "regardless of adjudication" permit an employer or the DCJS to rely on an allegation that was found false by a civil court or other tribunal? Because only § 6056.2(h)(1)(d)(i) contains that phrase, would such a finding foreclose reliance on the allegation under the other "misconduct" provisions?

[16] So does an officer commit "misconduct" by kissing a loved one while on duty?

[17] The definition of "gross misconduct" is so broad and vague that it reaches conduct that does not constitute "misconduct" as a matter of state law, including conduct protected by state law. *See infra*. Notably, a former version of § 6056.2 treated the same three sources of professional guidance (general practices, current public safety training, and law enforcement reports and literature) as mere factors that "the department" could consider in determining whether a "conflict of interest" constituted "misconduct." *See* Former 9 NYCRR § 6056.2(h)(1)(e)(ii) (Oct. 16, 2021) (defining "*misconduct*" as "includ[ing] … *conflicts of interest*," which in turn was defined to include "acts constituting gross misconduct," and providing that "in determining what constitutes 'incompetence or gross misconduct,' the department may take into account practices generally followed in the profession, current teaching at public safety training facilities, and technical reports and literature relevant to the field of law enforcement").

or removal during a probationary period as defined in § 6056.2(i)], as authorized by [GML] § 209-q(1)(b-1) and (c) and [CPL §] 2.30(6)." 9 NYCRR § 6056.4(e).[18]

32. The DCJS Commissioner "may require any employer to report … minutes of meetings or proceedings concerning … removal of police or peace officers." 9 NYCRR § 6056.4(b)(2).

33. Section 6056.7 provides that if it "shall appear to the [DCJS] commissioner or the commissioner's designee that there is a material inaccuracy in an employer's reporting of the reason [a police or peace] officer ceased to serve, as received by the commissioner pursuant to [Executive Law § 845(2)(b),] the commissioner shall attempt to resolve the perceived inaccuracy." 9 NYCRR § 6056.7(a). "If such attempt does not promptly resolve the discrepancy, the commissioner shall issue a notice to the employer and the officer who is the subject of such notification of the commissioner's intent to amend the inaccuracy of such record." *Id.* The employer or the officer may then submit a request "to the commissioner … for a hearing to be held by the [MPTC] to consider the accuracy of the [employer's] reporting of the reason an officer ceased to serve." *Id.* § 6056.7(a)(1). The hearing "shall" be "held at the next meeting of the [MPTC] or subsequent meeting or special meeting of the [MPTC]" and be "conducted in accordance with the provisions of the [SAPA]."[19] *Id.* § 6056.7(a)(2)–(3). Following the hearing, the MPTC submits its recommendation to the DCJS Commissioner, who then makes the final

---

[18] The DCJS's website provides that "under state law, a police or peace officer's basic training certificate is immediately invalidated when an officer is removed for cause for misconduct, or an officer has resigned or retired subsequent to, or in connection with, allegations of misconduct." (Ex. F: Screenshot of DCJS's Registry Webpage, at 2). "When an employer reports a removal for cause, or resignation or retirement due to allegations of misconduct, the [DCJS] updates its records to reflect that invalidation." (*Id.*).

[19] The MPTC meets about four times a year. *See* Exec. Law § 839(5).

decision. *Id.* § 6056.7(a)(3). Within 90 days of the hearing date, "the commissioner shall forward to the employer and the officer the decision and the reasons given for such decision." *Id.*

34. Section 6056.8 provides that upon request, "any person whose name is removed" from the Registry must be given "the opportunity to review all information in the possession of the [DCJS] on which such determination was based."[20] 9 NYCRR § 6056.8(a). The "person may present argument on issues of law and fact to the employer," which "may then resubmit such person's name for registration along with a statement of the reasons establishing such person's eligibility to be a police or peace officer." *Id.*

35. Section 6056.4(f) provides as follows:

> A [police officer] certificate … may be permanently invalidated upon a police officer's removal for cause pursuant to subdivision (d)(4) or (5) of this section and that police officer *may* be ineligible for any future certification as authorized by [GML] § 209-q(1)(b-1) and any police officer who may be eligible for an equivalency certificate pursuant to 9 NYCRR Part 6020.8 is ineligible for an equivalency upon that police officer's removal for cause pursuant to subdivision (d)(4) or (5) of this section and that police officer may be ineligible for any future certification as authorized by [GML] § 209-q(1)(b-1).

9 NYCRR § 6056.4(f).[21]

36. Section 6056.4(g) provides that upon "inquiry from an employer," the DCJS "shall notify the employer of the reason a police or peace officer ceased to be previously employed as reported pursuant to subdivision (d) of this section." 9 NYCRR § 6056.4(g).

---

[20] Upon an employer's RFC submission, the DCJS apparently removes the reported officer from the Registry. *See* 9 NYCRR § 6056.5(c) ("Each employer shall immediately notify the [DCJS] when an officer's registry information needs to be modified or deleted, including the effective date when such officer ceases to serve and the reason for such pursuant to section 6056.4(d).").

[21] No statute or regulation provides that a *peace* officer certificate "may be permanently invalidated."

### C. The DCJS's Established Policies, Procedures, and Practices

37. Upon an employer's submission of an RFC report concerning a police officer,[22] the DCJS categorically revokes the officer's certificate and permanently bans the officer from the policing profession.[23]

38. The DCJS treats revocation and disqualification as mandatory under GML § 209-q(1)(b-1), even though the statute leaves both decisions to the agency's discretion. In court, the DCJS takes the official position that an employer's submission of an RFC report triggers automatic revocation of a police officer's certificate "pursuant to [GML] § 209-q(1)(b-1) and 9 NYCRR §§ 6056.4(f)." *See, e.g.*, *Flynn v. Binghamton City* (Broome Cnty. Index No. EFCA2026002148), ECF No. 78 (DCJS's 09/09/2026 Mem. of Law in Support of Dismissal) at 12 (citing Aff. by Defendant Stephanie Russell). On that theory, decertification and disqualification of police officers occur "by operation of law," leaving the DCJS only the "ministerial" function of "merely" sending out notice to the officer. *Id.* at 8, 12.[24]

39. The DCJS likewise categorically decertifies peace officers upon an employer's submission of an RFC report.[25]

---

[22] Employers submit separation reports via electronic means.

[23] As noted on the DCJS's website, "all police officers removed for cause … will have their training permanently invalidated and no longer have the option of retaking the state-mandated basic training." (Ex. F).

[24] Defendant David Mahany has made similar representations in affidavits filed in state court.

[25] Although the DCJS categorically accepts employers' RFC determinations, the DCJS does scrutinize reports of "standard separations," or "standard removals." When the DCJS has reason to suspect that a "standard separation" may be a "removal for cause," the DCJS asks the employer to review Part 6056 with "their municipal attorney" to determine whether the separation meets the regulatory definition of "removal for cause."

40. The DCJS applies its broad and vague definition of "removal for cause" without exercising discretion. As a result, even officers who remain fully fit to serve lose their certification, and police officers among them are permanently barred from the policing profession. The DCJS imposes both consequences without advance notice or an opportunity to be heard.

41. The DCJS revokes police/peace officer certificates retroactive to the date of the officer's employment separation.

42. The DCJS does not require an employer's RFC report to provide any details about the "interruption from service" or "allegation(s) of misconduct." So if a police employer submits an RFC report that says nothing about the officer's employment separation or alleged "misconduct" other than the officer was separated "pursuant to any other applicable law" due to "gross misconduct pursuant to 9 NYCRR § 6056.2(h)(1)(f)," the DCJS will not only automatically decertify the officer but also automatically ban the officer from the policing profession for life.

43. The DCJS processes RFC reports even when there is no indication that the employer's "head" or "chief executive officer" made or adopted the underlying RFC determination. *See* Exec. Law § 845(2)(b); 9 NYCRR §6056.2(d). On information and belief, RFC determinations for officers separated from the New York City Police Department ("NYPD") are made by its Office of Management Analysis and Planning ("OMAP") and/or Personnel Bureau. Also on information and belief, the DCJS knows that the NYPD Commissioner (who is the NYPD's head and chief executive officer) neither makes nor adopts such determinations.

44. The DCJS does not enforce § 845(2)(b)'s and § 6056.4(d)'s requirements that employers "immediately" report an officer's employment separation.[26] Thus, the DCJS often

[26] On information and belief, the DCJS has never moved for a court order directing an employer to comply with § 845(2)'s reporting requirement. *See* Exec. Law § 845(4).

receives an RFC report months after the officer separates from employment. Indeed, the DCJS permits the NYPD to submit separation reports on a quarterly basis.

45. Some days after receiving an RFC report, the DCJS sends a letter to the employer stating that "based on" the report, the subject officer "is no longer active with your agency on the … Registry."

46. If notice is sent out to the subject officer, the DCJS uses the home mailing address provided by the officer's former employer.

47. If the employer does not provide a mailing address, the DCJS makes no attempt to notify the subject officer. The DCJS even fails to send notice when the employer has the officer's mailing address.

48. After an employer submits an RFC report, the DCJS often waits a couple of months to notify the officer. In some cases, the DCJS has taken five months or more after submission of an RFC report to issue notice. As a result, an officer may not receive notice of decertification/disqualification until 10 months after the effective RFC date.

49. Notice sent out by the DCJS to a reported police officer merely states the following: (a) your former employer reported you to the DCJS as a "removal for cause" under a specified subparagraph of § 6056.2(h)(2) or under § 6056.2(i);[27] (b) because you were reported as a "removal for cause," and "in accordance with" GML § 209-q(1)(b-1) or 9 NYCRR § 6056.4(e), your police officer certificate "has been permanently invalidated and you are ineligible for any future certification"; and (c) you could email a specified DCJS employee if you have "any questions or concerns."

---

[27] Sections 6056.2(h)(2) and (i) define "interruption from service" and "removal during a probationary period," respectively. The notice neither mentions the word "misconduct" nor indicates the alleged category of "misconduct," such as "gross negligence" or "gross misconduct."

50. Notice sent to a reported peace officer merely states the following: (a) your former employer reported that "you ceased to serve … due to incompetence or misconduct" under a specified subparagraph of § 6056.2(h)(2) or under § 6056.2(i);[28] (b) "consequently," under 9 NYCRR § 6056.4(e), your peace officer certificate has been "invalidated"; and (c) you could email a specified DCJS employee if you have "any questions or concerns."

51. If the subject officer sends an email to the specified DCJS employee, the officer is typically told something along the following lines: (a) under § 6056.7, you may request that the DCJS review whether there is a "material inaccuracy" in your former employer's "reporting of your RFC" by submitting a "letter explaining why your separation from employment didn't meet the definition of an RFC under 9 NYCRR 6056.2(h), along with any supporting documentation"; (b) "upon receipt of your letter, the DCJS will request a similar written explanation from the [employer] detailing their reporting with any supporting documentation"; and (c) the DCJS "will review all the information submitted by both parties to determine if your removal met the definition of an RFC"; but (d) "any issues of the law or facts related to your [separation] must be presented to your employer."

52. It is the DCJS's position that the former employer is responsible for giving an officer the opportunity to contest the alleged "misconduct," even when the employer discharged the officer without notice or explanation.

53. If the subject officer asks the DCJS to identify the alleged misconduct underlying the employer's RFC determination, the DCJS will instruct the officer to contact the former employer "directly" for "specific information" regarding "the separation" or "the circumstances

---

[28] Part 6056 formerly defined "for cause" as "for incompetence or misconduct." Former 9 NYCRR § 6056.2(g) (Apr. 12, 2017). However, the DCJS continues to use that language in notices to reported peace officers.

surrounding your removal for cause." After all, the DCJS "does not collect details about specific incidents or conduct leading to reporting under [Part 6056]." (Ex. G: DCJS Memo to Chief Law Enforcement Officers (Oct. 8, 2021)).

54. Even if an officer informs the DCJS that a direct inquiry to the former employer yielded no further information, the DCJS will refer the officer to § 6056.7.

55. The DCJS will not resolve a subject officer's request for a so-called "§ 6056.7 review" unless and until the employer submits a "written explanation" to the DCJS.

56. An employer who does submit a "written explanation" is not required to send a copy to the subject officer. And the DCJS will not on its own initiative forward the employer's submission to the officer. Indeed, the DCJS generally withholds an employer's submission even upon the officer's request for it.

57. On information and belief, the DCJS has never asked (let alone compelled) an employer to provide "minutes of meetings or proceedings concerning … removal" of an officer. *See* 9 NYCRR § 6056.4(b)(2).

58. The DCJS resolves a subject officer's § 6056.7 request (as to whether there is a "material inaccuracy" in an employer's RFC report) based solely on whether the employer's allegations reflect that the officer was fired or resigned "in connection with" an "allegation" of "misconduct." Thus, the DCJS treats as irrelevant both the truth of the underlying alleged "misconduct" and its bearing on the officer's fitness to serve.

59. The DCJS will deny an officer's § 6056.7 request even if the employer submits no evidence supporting the "written explanation."

60. When a § 6056.7 request is denied, the DCJS sends the subject officer a letter that merely states that after a "review of all the documents provided by [your former employer] and …

by you," the DCJS "has determined that there is no material inaccuracy in [the employer's] report of [you] as an RFC" and thus has denied "your request for a hearing."

61. At least as of June 1, 2026, the DCJS has not once held a § 6056.7 hearing. That is not surprising, given that the only inquiry relevant at the § 6056.7 stage is the legal one of whether the employer's allegations reflect that the officer was fired or resigned "in connection with" an "allegation of misconduct."

62. The DCJS allows disqualified police officers to obtain a peace officer certificate. Similarly, the DCJS allows decertified peace officers to obtain a police officer certificate as well as a new peace officer certificate.

63. On its website, the DCJS publishes an Excel document called the "Police/Peace Officer Decertification List."[29] According to the DCJS, this Decertification List is an "official record of information as reported by police and peace officer employers to the [DCJS]." (Ex. F).

64. The Decertification List includes the names of all decertified officers; the names of the employers who submitted the RFC report; the "CPL[] appointment" (e.g., § 1.20(34)); the effective RFC date; and the "regulatory type of RFC" (e.g., "Removal for Cause - 9 NYCRR § 6056.2(g)(1)(c): pursuant to any other applicable law").

65. The DCJS does not inform reported officers of their placement on the Decertification List.

66. The DCJS "provides decertification information to the National Decertification Index" (which is a national registry of decertified law enforcement officers) and instructs "all

---

[29] *Available* at https://criminaljustice.ny.gov/police-peace-officer-registry (last visited Nov. 2, 2026). The Registry, on the other hand, is not available to the public.

police employers [to] check the Decertification Index prior to hiring an individual and comply with other state-mandated hiring requirements."

67. If an officer who is listed on the Decertification List seeks employment as a police or peace officer, the DCJS informs the prospective employer of the officer's decertification and/or disqualification. The DCJS also informs the prospective employer of the "regulatory reason [the officer] ceased to be previously employed" and the underlying "type of misconduct."

68. Decertified officers remain on the Decertification List for life.

## THE PARTIES

### I. Defendants

69. All Defendants are sued in both their official and individual capacities for conduct they engaged in and continue to engage in under color of state law.

70. Defendant Rossana Rosado is and was at all relevant times the DCJS's Commissioner. Thus, she was and continues to be responsible for the DCJS's policies, practices, and operations; for the appointment, training, supervision, and conduct of all DCJS personnel; for enforcing all laws applicable to the DCJS; and for ensuring that DCJS personnel obey all federal and state laws. She also has administered and continues to administer the DCJS's decertification/disqualification scheme ("Scheme"), including by conducting § 6056.7 reviews and determining whether an employer's RFC report is "inaccurate in a material respect."

71. Defendant Stephanie Russell is and was at all relevant times a criminal justice program specialist for the DCJS's Office of Public Safety. Thus, she has administered and continues to administer the Scheme, including by reviewing and processing RFC reports, issuing notices to the subject officer and employer, and conducting § 6056.7 reviews.

72. Defendant Stephanie Hoffman is and was at all relevant times a DCJS criminal justice program specialist who has administered and continues to administer the Scheme, including by reviewing and processing RFC reports, issuing notices to the subject officer and employer, and conducting § 6056.7 reviews.

73. Defendant Kelly Conlon was at all relevant times a DCJS criminal justice program specialist who administered the Scheme, including by reviewing and processing RFC reports, issuing notices to the subject officer and employer, and conducting § 6056.7 reviews.

74. Defendant David Mahany was at all relevant times a DCJS associate training technician who administered the Scheme, including by reviewing and processing RFC reports, issuing notices to the subject officer and employer, and conducting § 6056.7 reviews.

75. Defendant Adam Dean is and was at all relevant times the DCJS's Deputy Commissioner of Operations and Innovation. He has administered and continues to administer the Scheme, including by participating in resolving § 6056.7 requests.

76. Defendant Michael Bonse is and was at all relevant times the Deputy Commissioner for the DCJS's Office of Public Safety. He has administered and continues to administer the Scheme, including by conducting § 6056.7 reviews.

77. Defendant Colleen Glavin is and was at all relevant times Counsel and Deputy Commissioner for the DCJS's Office of Legal Services. As such, and on information and belief, she was and continues to be responsible for the DCJS's policies, practices, and operations; for the appointment, training, supervision, and conduct of all DCJS personnel; for enforcing all laws applicable to the DCJS; and for ensuring that DCJS personnel obey all federal and state laws. She also has administered and continues to administer the Scheme, including by addressing legal

questions concerning its interpretation and application as well as in participating in resolving § 6056.7 requests.

78. Defendant Jennifer Grasso is and was at all relevant times an associate attorney in the DCJS's Office of Legal Services. She has administered and continues to administer the Scheme, including by addressing legal questions concerning its interpretation and application as well as in participating in resolving § 6056.7 requests.

79. Defendants, separately and in concert, committed and continue to commit conduct driven by evil motive and intent as well as with reckless and callous indifference to clearly established due process laws.

## II. Plaintiffs

80. At all relevant times, Plaintiffs Chanel Garcia, Argenis Betanco, Linpeng Gao, Kevin Doyle, Nerys Ramirez, Jack Nazaire, Carl Delouis, Victor Guzman, Richard Delahanty, and Keven Sanchez served as full-time police officers of the NYPD, which is headquartered in Manhattan. Plaintiff Danny Quintanal served as a full-time peace officer for Riverbay Corporation, which is located in the Bronx.[30]

81. All Plaintiffs relied on their police/peace officer certification for their livelihood.

*Chanel Garcia (born in 1997)*

82. In 2019, Plaintiff Chanel Garcia graduated from Kean University with a degree in criminal justice.

---

[30] Mackenson Vil and Brendon Torres (who were named in the initial complaint) withdraw as named plaintiffs, without prejudice to their participation as absent members of any certified class or subclass whose definition they satisfy, subject to any applicable right to opt out.

83. On July 13, 2022, Garcia was appointed as a police officer by the New York City Police Department ("NYPD"). She was issued her police officer certificate approximately six months later.

84. On May 8, 2025, while Garcia was still in her entry-level probationary period, the NYPD summarily fired her without any specific explanation.[31]

85. On August 14, 2025, Garcia received a letter from Defendant Kelly Conlon that stated only the following:

> I am writing to inform you of the change in your police officer basic training certification status due to your recent removal from the New York City Police Department (NYPD) on the Central State Registry of Police Officers and Peace Officers.
>
> Please be advised on August 6, 2025, the NYPD reported you to the Division of Criminal Justice Services as a removal for cause pursuant to section 9 NYCRR Part 6056.2(h)(2)(a)(iii) effective May 8, 2025.
>
> Effective October 16, 2021, pursuant to section 9 NYCRR Part 6056.4(f)[32] a certificate awarded under General Municipal Law (GML) § 209-q(1)(b) may be permanently invalidated upon a police officer's removal for cause or removal during a probationary period.
>
> Consequently, in accordance with GML § 209-q(1)(b-1), your basic training certification has been permanently invalidated effective immediately and you are ineligible for any future certification.
>
> Should you have any questions or concerns, please feel free to contact me by email at Kelly.conlon@dcjs.ny.gov.

---

[31] The NYPD merely informed Garcia that she was fired "pursuant to the New York City Department of Citywide Administrative Services Personnel Rules and Regulations 5.2.7." Under that provision, an "agency head may terminate the employment of any [entry-level] probationer whose conduct and performance is not satisfactory." 55 RCNY (Rules of the City of New York) app. A, ¶ 5.2.7(c).

[32] The most recent substantive amendments to Part 6056 took effect on October 16, 2021.

86. In an email sent to Conlon on September 18, 2025, Garcia requested the NYPD's reporting data. Conlon then emailed Garcia a document reflecting that the NYPD had reported her as follows:

| **Removal for Cause Type** | **Separation Reasons and Details** | **Synopsis** |
|---|---|---|
| Delete - Removal for Cause - 9 NYCRR § 6056.2(h)(2)(a)(iii): pursuant to any other applicable law[33] | Gross Misconduct pursuant to 9 NYCRR §6056.2(h)(1)(f) | R resided outside NYC and approved NY counties, and failed to notify CO of her change of address. |

87. Conlon also emailed Garcia the following:

> Pursuant to 9 NYCRR 6056.7, if you believe there is a material inaccuracy in the NYPD's reporting of your RFC, you may request the DCJS to review the same. To initiate a review, please send to the attention of Stephanie Russell, a letter explaining why your separation from employment didn't meet the definition of an RFC under 9 NYCRR 6056.2(h), along with any supporting documentation.
>
> Upon receipt of your letter, the DCJS will request a similar written explanation from the NYPD detailing their reporting with any supporting documentation. We will review all the information submitted by both parties to determine if your removal met the definition of an RFC. However, any issues of the law or facts related to your resignation[34] must be presented to your employer.

88. Subsequently, Garcia sent Defendant Stephanie Russell an email pursuant to § 6056.7, requesting that the DCJS review whether there was a "material inaccuracy in the NYPD's reporting of [her] RFC."

89. On September 22, 2025, some DCJS official requested from the NYPD's Commissioner a "letter outlining the circumstances of Officer Garcia's separation from service and any and all documents related to [her] separation from service."

---

[33] However, Garcia's "removal for cause type" should have been § 6056.2(i) (removal during a probationary period).

[34] So in original.

90. On October 23, 2025, Garcia (now through undersigned counsel) asked Russell whether the NYPD had responded to the DCJS's request for information. Russell responded in the negative.

91. On October 27, 2025, Garcia asked Russell to be forwarded any submission made by the NYPD Commissioner.

92. On October 30, 2025, Russell responded as follows:

> The NYPD provided the requested documentation on October 24, 2025. As our review has commenced, the material submitted by the NYPD will be available after our review is complete pursuant to 9 NYCRR 6056.8.

Some hours later, Garcia urged Russell to disclose the NYPD's documentation.

93. On November 7, 2025, Russell emailed Garcia the following:

> I have been advised that I may release the document provided by the NYPD, despite Ms. Garcia's requested 6056.7 review having commenced. I have attached that document.
>
> Please advise if you would like us to continue our review, or if you would like us to pause while you address this issue directly with the NYPD.

94. The document attached to Russell's email was a letter from the NYPD stating the following:

> Pursuant to 9 NYCRR Part 6056, the [NYPD] is required to notify your agency when a uniformed member of our service meets the criteria for potential decertification based upon removal for cause as defined in 9 NYCRR 6056.2(h). An electronic version of this notification was previously made to your agency concerning former NYPD Police Officer Chanel Garcia and your agency has requested information and documentation for further review.
>
> Garcia was subjected to a disciplinary termination after it was substantiated that she engaged in conduct prejudicial to the good order, efficiency or discipline of the Department in that she resided in Teaneck, New Jersey, for a significant period of time despite the residency requirements for individuals employed as Police Officers. She was on probation at the time of the offense and, as a result, internal disciplinary proceedings would not have been required for her employment to be terminated. However, the recommended penalty for this particular

> disciplinary investigation was consistent with the NYPD Disciplinary Matrix[35] wherein residing outside the required counties in New York State could have resulted in the forfeiture of thirty (30) vacation days and placing her on dismissal probation.[36]

95. On November 10, 2025, Garcia requested from Russell that the DCJS pause its § 6056.7 review so that she could address the matter with the NYPD. Russell granted the request.

96. In a letter sent to the NYPD on November 19, 2025, Garcia requested that she be re-reported as a "standard removal," pointing out that her violation of the residency requirement did not constitute "misconduct" as a matter of law from this state's highest court. *See Beck-Nichols v. Bianco*, 20 N.Y.3d 540, 557–58 (2013) (holding that an employer's residency requirement merely "defines eligibility for employment, and so is unrelated to job performance, misconduct or competency"). Garcia also noted that (a) she had temporarily relocated from New York City to New Jersey to serve as the primary caregiver for her father, who was receiving intensive treatment for stage III cancer and needed assistance with basic daily activities; and (b) her failure to maintain eligibility for employment would not have resulted in her termination had she been off of entry-level probation and had permanent employee status.[37]

---

[35] The NYPD's Disciplinary Matrix (also known as the "Disciplinary System Penalty Guidelines" and is available at https://nypdonline.org/link/1024) sets forth "presumptive penalties for acts of misconduct and violations of Department policy." NYPD Matrix at 8. "The ultimate penalty assigned is guided by the penalty ranges between the mitigated and aggravated penalties, as defined in these Guidelines." *Id.* at 9.

[36] *See* NYPD Disciplinary Matrix at 8 (providing that "Residing outside residence Counties" warrants a "presumptive penalty" of "30 penalty days" and an "aggravated penalty" of "30 penalty days + dismissal probation"), 15 ("The term penalty days refers to the forfeiture of vacation days and/or the imposition of suspension without pay for a specified time period.").

[37] In contrast to a permanent employee, an entry-level probationer "may be dismissed for almost any reason, or for no reason at all." *Swinton v. Safir*, 93 N.Y.2d 758, 762–63 (1999); *see also* NYPD Disciplinary Matrix at 14 (noting that an entry-level probationer may be fired "for offenses that would not generally result in termination for a tenured employee").

97. In mid-January 2026, the NYPD denied Garcia's re-reporting request on the basis that her residency infraction satisfied § 6056.2(h)'s definition of "gross misconduct."

98. In a letter submitted to Russell on January 27, 2026, Garcia noted that her residency infraction did not constitute "misconduct" as a matter of law and explained why she had temporarily moved to New Jersey. Garcia also noted that even if her infraction somehow constituted "misconduct" that was somehow "gross," there was no legitimate reason for decertifying her (let alone disqualifying her) based on a violation of an employment condition that would not have resulted in her termination had she been off entry-level probation.

99. On February 25, 2026, Garcia asked Russell for an update on her § 6057 request. Three workdays later, Russell responded that "we are in the final stages of review."

100. On March 16, 2026, Garcia again asked Russell for an update. Four workdays later, Russell responded, "We are in the final stages of review and I hope to have this completed in the very near future."

101. On April 7, 2026 (but unbeknownst to Garcia at the time), Defendant Michael Bonse issued a letter to the NYPD Commissioner, stating that the DCJS had "concluded that Officer Garcia's separation from service was not subsequent to and in connection with the alleged misconduct in accordance with 9 NYCRR §6056.2(h)" and thus intended to amend her record on the Registry from a "removal for cause" to a standard removal. Bonse also told the NYPD Commissioner that "within 15 days of the receipt of this notice," "you may request a hearing to be held by the Municipal Police Training Council to consider the accuracy of your agency's reporting of the reason Officer Garcia ceased to serve."

102. On April 23, 2026, Russell told Garcia the following:

> [W]e have concluded our review and intend to change [your] record to a standard separation. We have notified the NYPD in writing of our intention and per

> regulation, they have fifteen (15) days in which to request a hearing. We are in that 15-day timeframe now. Once that timeframe expires, and if the NYPD has not requested a hearing, I will send an official notification letter of the change for your records.

103. On May 6, 2026 (which was 29 days after Bonse issued his letter to the NYPD Commissioner), Russell informed Garcia that the DCJS had "determined that the underlying circumstances related to [her] separation did not meet the standard established in 9 NYCRR § 6056.2(h)(1)(f) for a removal for cause" and thus "amended [her] record on the Registry from a removal for cause to a standard separation."

*Argenis Betanco (born in 1993)*

104. In 2016, Plaintiff Argenis Betanco received a criminal justice degree from John Jay College of Criminal Justice and joined the NYPD as a police cadet.

105. Betanco was appointed as an NYPD police officer on April 12, 2017, and was issued his police officer certificate some months later.

106. In approximately September 2022, Betanco applied to the New Jersey State Police ("NJSP") for a trooper position.

107. On March 12, 2023, Betanco accepted an offer from the NJSP to become a trooper recruit. He thus retired from the NYPD on March 16, 2023.

108. During Betanco's six years of service for the NYPD, he was rated "exceptional" or "exceeds expectations" on his annual performance evaluations; earned numerous police duty medals; made 150 arrests; was the subject of only one set of disciplinary charges; and was never removed from full-duty status.

109. On March 20, 2023, Betanco entered the NJSP's Academy. He was appointed as a NJSP trooper in August 2023.

110. On September 5, 2024, the New Jersey Police Training Commission suspended Betanco's New Jersey law enforcement license on the basis that he was listed on the National Decertification Index.

111. Subsequently, Betanco learned that he was listed on the National Decertification Index as a result of the NYPD reporting him to the DCJS as a "removal for cause."

112. In an email sent to Defendant David Mahany on October 2, 2024, Betanco (through undersigned counsel) asked to be sent all information in the DCJS's possession regarding him.

113. On October 7, 2024, Defendant Stephanie Russell sent Betanco a letter, dated May 24, 2023, and issued by Russell to Betanco, stating that he had been decertified and disqualified from "any future certification" because "on May 8, 2023, the [NYPD] reported [him] … as a removal for cause pursuant to section 9 NYCRR Part 6056.2(h)(2)(b) effective March 16, 2023."[38] Russell also sent Betanco a document reflecting that the NYPD had reported him as follows:

| Removal for Cause Type | Separation Reasons and Details | Synopsis |
|---|---|---|
| Delete - Removal for Cause - 9 NYCRR § 6056.2(h)(2)(b): an employee's resignation or retirement | Gross Negligence pursuant to 9 NYCRR §6056.2(h)(1)(e) | Failed to conduct a proper search of a prisoner, and failed to remain with prisoner at all times when not relieved by an arrest processing officer.[39] |

114. On October 16, 2024, Betanco submitted a § 6056.7 request to Mahany. Betanco acknowledged that when he resigned from the NYPD, there were pending against him disciplinary charges alleging that he had failed to conduct a "thorough" search of an arrestee and failed to "remain with his prisoner at all times when not relieved by an arrest processing officer." Betanco noted, however, that the NYPD Disciplinary Matrix and New York Court of Appeals case law

[38] Betanco did not receive Russell's letter before October 7, 2024.

[39] The NYPD's "Synopsis" referred to an incident that occurred in the Bronx.

demonstrated that his alleged misconduct was not a "gross" deviation from how a reasonable officer would act. In fact, Betanco pointed out, the NYPD's own allegations established that his search of the arrestee was not improper. Betanco also noted that under the NYPD's Disciplinary Matrix and precedent, his alleged misconduct warranted the loss of vacation days or some other minor penalty.

115. In that same email, Betanco noted the pending PTC matter and thus requested that his § 6056.7 request be expedited given that his livelihood was on the line.

116. On or about October 17, 2024, Russell requested from the NYPD "a letter outlining the circumstances of Mr. Betanco's separation from employment that supports [the NYPD's] report of a removal for cause" and "all documents supporting said reporting (i.e. disciplinary or internal investigative files)."

117. On November 21, 2024, Betanco (who had not heard from the DCJS since October 22, 2024) suggested to Russell and Mahany that notice be issued to the NYPD under Executive Law § 845(3) (which authorizes the DCJS to proceed to determining whether an RFC report contains a material inaccuracy after giving the employer "notice and an opportunity to be heard"). Russell responded, "We followed up on … November 19th and are hoping to receive something soon from the NYPD."

118. On January 13, 2025, Betanco asked Russell and Mahany for an update. A couple of workdays later, Russell emailed Betanco, "We reached out to the NYPD again and were advised they have a meeting scheduled this week to discuss this case."

119. On February 26, 2025, Betanco submitted an amended § 6056.7 request to Mahany. In addition to reiterating the points made in his original request, Betanco noted that because he

was going to join the NJSP regardless of the NYPD's then-pending disciplinary charges, he did not retire from the NYPD "in connection with" the NYPD's charges.

120. On February 27, 2025, Mahany emailed Betanco, "[W]e are still waiting on a letter [from the NYPD] articulating their position on why their RFC report was accurate and how the circumstances surrounding Betanco's resignation met the RFC definition under 6056.2(h)." Betanco responded with a request that the DCJS resolve his § 6056.7 request without a response from the NYPD.

121. On April 8, 2025, Betanco asked Mahany for an update and asked whether § 845(3) notice was given to the NYPD. Three workdays later (a Friday), Mahany emailed Betanco, "[W]e received the requested information from NYPD last week. We are currently in the final review stages. I'm hopeful that we'll have more information for you towards the end of next week."

122. The "information" that the DCJS received from the NYPD was an April 3, 2025, letter that was sent to Defendant Adam Dean. In the letter, the NYPD stated that Betanco would not have been fired if he had been adjudicated guilty of the pending charges.

123. On April 24, 2025, Betanco asked Mahany for an update. The next day (a Friday), Mahany emailed Betanco, "[Your] case is currently being reviewed by our DCJS executive team. I'm going to follow up with them early next week and get back to you on status."

124. In a letter that was mailed out to the NYPD Commissioner on May 8, 2025, Defendant Rossana Rosado stated that the DCJS had concluded that Officer Betanco's resignation "was not subsequent to and in connection with the alleged misconduct in accordance with 9 NYCRR §6056.2(h)" and thus intended to amend his Registry record from a "removal for cause" to a standard resignation.

125. On June 2, 2025, Mahany informed Betanco that the DCJS had "determined that the underlying circumstances related to [his] resignation did not meet the standard established in 9 NYCRR § 6056.2(h)(1)(b)[40] for a removal for cause" and thus "amended [his] record on the Registry … to a standard resignation."

126. Given the DCJS's amendment, Betanco's New Jersey law enforcement license was eventually reinstated.

*Linpeng Gao (born in 1990)*

127. Plaintiff Linpeng Gao was appointed as an NYPD police officer on October 15, 2021, and was issued his police officer certificate some months later.

128. On May 14, 2024, while Gao was still on entry-level probation, the NYPD summarily fired him without any specific explanation.

129. In a letter issued on August 21, 2024, Defendant David Mahany informed Gao that he had been decertified and disqualified because "on August 20, 2024, the [NYPD] reported [him] … as a removal for cause pursuant to section 9 NYCRR Part 6056.2(i) effective May 14, 2024."

130. On August 28, 2024, Gao (through undersigned counsel) emailed Mahany for the NYPD's reporting data.

131. On September 3, 2024, Defendant Kelly Conlon sent Gao a document reflecting that the NYPD had reported him as follows:

| **Removal for Cause Type** | **Separation Reasons and Details** | **Synopsis** |
|---|---|---|
| Delete - Removal for Cause - 9 NYCRR §6056.2(i): removal during a probationary period means a probationary period not | Gross Misconduct pursuant to 9 NYCRR §6056.2(h)(1)(f) | Entry level probation termination |

[40] So in original. As previously mentioned, § 6056.2(h)(1)(b) provides that "misconduct, includes … dishonesty."

| | | |
|---|---|---|
| successfully completed due to conduct defined in 9 NYCRR §6056.2(h)(1) | | |

132. On September 5, 2024, Gao asked Conlon to find out from the NYPD what conduct he allegedly committed that allegedly constituted "gross misconduct." Conlon responded, "You'll need to reach out to the [NYPD] directly for specific information concerning the separation."

133. Gao then asked the NYPD to specify what he allegedly did that constituted "gross misconduct," but the NYPD denied his request.

134. On September 23, 2024, Gao informed Conlon of the NYPD's denial. Mahany responded as follows:

> I have sent [the NYPD] an email advising [it] that you have not formally requested a review pursuant to 9 NYCRR 6056.7; therefore, DCJS would not be involved in this matter at this point. It's my understanding that you are only seeking specifics related to your … "gross misconduct" reported by the NYPD. This information will need to come from NYPD since we don't have the underlying reasons related to the "gross misconduct."

135. In a § 6056.7 request sent to Mahany on March 4, 2025, Gao noted that he did not know specifically why he was fired from the NYPD or why he was reported by the NYPD to have committed "gross misconduct." Thus, Gao asked for the opportunity to respond to any submissions made by the NYPD.

136. As of June 12, 2025, the DCJS was still "awaiting further documentation from NYPD."

137. In a letter that Gao received from Russell on July 14, 2025, she stated the following:

> In an effort to determine if Mr. Gao's RFC was reported accurately in accordance with 9 NYCRR § 6056.2(i) the Division requested that the NYPD forward any and all NYPD's [sic] related to Mr. Gao's separation from employment as a police officer. After a careful and thorough review of all the documents provided by the NYPD[41] and the letter with supporting documentation provided

[41] But the DCJS had failed to provide Gao with the "documents provided by the NYPD."

> by you, the Division has determined that there is no material inaccuracy in the NYPD's report of Mr. Gao as an RFC.
>
> Please be advised that a hearing shall only be held pursuant to 9 NYCRR § 6056.7[(a)](2) if the Commissioner determines there is a discrepancy in the employer's reporting and their attempt to resolve such inaccuracy is unsuccessful. Since it has been determined that there is no material inaccuracy in NYPD's reporting of Mr. Gao's RFC, your request for a hearing is denied.[42] This review is subject to 9 NYCRR § 6056.8.

138. On July 14, 2025, Gao asked Russell to send him all information on which the DCJS denied his § 6056.7 request. Russell responded by sending Gao a letter that the NYPD had issued to the DCJS on June 25, 2025. In the letter, the NYPD stated the following:

> Former Police Officer Gao separated from the NYPD effective May 14, 2024, as a result of a disciplinary termination while on probation due to substantiated disciplinary allegations against him. As he was on probation, internal disciplinary proceedings were not required for his employment to be terminated. The substantiated allegations against Mr. Gao across numerous dates included computer misuse (over 100 unauthorized searches for investigative records, enforcement records and New York State Department of Motor Vehicle Records), failure to disclose to the Department pursuant to regulations that he was traveling to China during a leave of absence, operation of a personal motor vehicle without a valid registration and using an invalid out-of-state license plate, intentional obstruction of a license plate on his personal vehicle and driving a motorized scooter in the opposite direction of traffic for approximately one block. In addition, while on probation Mr. Gao received discipline in the form of a Command Discipline for failing to be truthful when questioned by a supervisor in relation to a domestic incident.

139. On July 15, 2025, Gao asked Russell to specify which one of his alleged acts constituted "gross misconduct" and to explain why he was decertified and disqualified. Russell responded as follows:

> Pursuant to 9 NYCRR 6056.2, gross misconduct is defined as: "an act which a department determines does not comply with practices generally followed in the profession, current teaching at public safety training facilities, and technical reports and literature relevant to the field of law enforcement." For further information,

---

[42] But Gao had not requested a hearing, because he still did not know what "gross misconduct" he had allegedly committed that resulted in his decertification and disqualification.

> please refer to the documentation provided pursuant to your most recent 9 NYCRR 60[56].8 request, or contact the NYPD directly.
>
> Please see General Municipal Law § 209-q(1)(b-1) and 9 NYCRR § 6056.4(e) and (f).

140. On July 17, 2025, Gao noted to Russell that his questions were not answered.

141. On July 22, 2025, Defendant Jennifer Grasso emailed Gao the following:

> Your inquiry has been forwarded to my attention.
>
> The nature of DCJS's review is as to whether there is a material inaccuracy in the employer's report of the reason an officer ceased to serve. Here DCJS found no material inaccuracy in NYPD's report of the reason Mr. Gao ceased to serve (removal for cause as defined in 9 NYCRR § 6056.2(h)).
>
> The permanent invalidation of the basic training certification occurs upon removal for cause pursuant to law and regulation, specifically General Municipal Law § 209-q(1)(b) and 9 NYCRR § 6056.4.
>
> For further information, you may wish to refer to the materials previously provided pursuant to your 9 NYCRR 6056.8 request together with the regulations found at 9 NYCRR Part 6056 or contact NYPD.

142. Subsequently, Grasso informed Gao that she could not identify which one of his alleged acts of "misconduct" constituted "gross misconduct."

143. Gao remains decertified and disqualified.

*Kevin Doyle (born in 1993)*

144. Beginning in 2019, Plaintiff Kevin Doyle served as a police officer in Ulster County. He was issued his police officer certificate in July 2020.

145. In January 2023, Doyle resigned from the Town of Lloyd Police Department to join the NYPD.

146. According to the undersheriff of the Ulster County Sheriff's Office, Doyle "served with distinction as an Investigator assigned from the Town of Lloyd Police Department to the

Ulster Regional Gang Enforcement Narcotics Team," consistently performing in a "professional, competent, and reliable manner."

147. Doyle served as an NYPD police officer from January 17, 2023, to February 6, 2026, when he was summarily fired without any specific explanation.

148. During Doyle's three years with the NYPD, he contributed to over 200 arrests (including over 110 felony arrests), was awarded nearly a dozen police duty medals, earned two commendations, and received an "Officer of the Month" recognition.

149. In the fall of 2024, when an NYPD commanding officer recommended Doyle for assignment to the NYPD's Narcotics Unit, two detective sergeants of the Ulster Sheriff's Office wrote letters to the NYPD in support of the assignment. One of the sergeants told the NYPD about Doyle's "unique blend of integrity, expertise, and an unwavering commitment to combating drug-related crime":

> Officer Doyle demonstrates an unparalleled work ethic, with a relentless drive to pursue justice and a keen instinct for investigative work. His attention to detail, analytical skills, and intuition allowed him to identify critical leads that are often overlooked. Officer Doyle has shown impressive results in drug-related cases and interdiction, consistently exceeding expectations and demonstrating an in-depth understanding of the nuances of narcotics work.
>
> In addition to [his] technical skills, Officer Doyle possesses the calmness and professionalism needed in high-stakes situations. He has faced complex cases that required both patience and resilience, and he has handled these with the utmost dedication. Officer Doyle's ability to remain focused and clear-headed under pressure has earned [him] the respect and trust of both peers and supervisors alike. Additionally, Officer Doyle was utilized during a federal Title III Wiretap and was entrusted with the trust and confidence to maintain confidentiality and the highest level of integrity of monitoring intercepted electronic and wire communications.
>
> Furthermore, Officer Doyle is a strong communicator and team player, which is essential for success in the collaborative environment of a narcotics unit. He is skilled at building rapport, not only with colleagues but also with community members and informants, enhancing the overall effectiveness of operations. His respect for community relationships and commitment to public service has been

> evident throughout his career, and I am confident that he will bring this same level of dedication to the Narcotics Unit of the New York City Police Department.
>
> Officer Doyle's dedication to professional development is equally impressive; [he] actively seek[s] training opportunities and continuously strive[s] to stay informed on emerging drug trends and investigative techniques. Officer Doyle has attended multiple training courses, on his own time and money, to further his knowledge and understanding of criminal street gangs, outlaw motorcycle gangs, and narcotics trafficking. His initiative and passion for his work positions him as a future leader in narcotics enforcement.

150. After Doyle's termination, several of his former NYPD supervisors wrote letters recommending his employment with other police departments. In particular, an NYPD sergeant wrote that Doyle is one of the "best and most talented Police Officers and Detectives in the country." Another NYPD sergeant wrote about how Doyle "consistently demonstrated an extraordinary breadth of exceptional skills in law enforcement" and "show[ed] remarkable leadership qualities." Yet another NYPD sergeant wrote about "the outstanding qualities that make Officer Doyle an ideal candidate for any police department." And an NYPD lieutenant discussed Doyle's "integrity, professionalism, and respect when dealing with the public, co[-]workers, and his superior officers."

151. On about June 4, 2026, Doyle received a letter from Defendant Stephanie Russell stating that he had been decertified and disqualified because "on May 22, 2026, the NYPD reported [him] … as a removal for cause pursuant to section 9 NYCRR Part 6056.2(h)(2)(a)(iii) effective February 6, 2026."

152. On June 12, 2026, Doyle (through undersigned counsel) asked Russell for the NYPD's reporting data. On June 15, 2026, Russell sent Doyle a document reflecting that the NYPD had reported him as follows:

| Removal for Cause Type | Separation Reasons and Details | Synopsis |
|---|---|---|
| Delete - Removal for Cause - 9 NYCRR § 6056.2(h)(2)(a)(iii): pursuant to any other applicable law | Gross Misconduct pursuant to 9 NYCRR §6056.2(h)(1)(f) | Improper vehicle pursuit. R used improper force tactics. R failed to activate BWC, failed to make A/L entries and required reports. R wrongfully arrested individual, did not obtain medical treatment for individual, and issued unlawful summons without sufficient legal authority.[43] |

153. On June 25, 2026, Doyle requested from the NYPD that it re-report him as a standard removal, explaining that many of the allegations of "misconduct" were false. However, the NYPD referred Doyle to the DCJS.

154. In a § 6056.7 request submitted to Russell on July 8, 2026, Doyle noted that the following occurred late one night in January 2025:

> Doyle and his then-partner, Police Officer Michael Saline, were in a marked RMP (radio motor patrol vehicle) and saw someone on the road driving recklessly. Saline (who was driving the RMP) activated his emergency lights, but the reckless driver did not stop. While Saline pursued the fleeing vehicle, one of its passengers kept taunting Saline and Doyle by making a finger-gun hand gesture and pretending to shoot at them. When the fleeing vehicle slowed down due to traffic, Doyle threw a shatterball device (a non-sharp spiked steel ball that is designed to safely breach tempered auto glass during emergencies) at the vehicle's rear window to gain visibility on the occupants. The shatterball successfully broke the window, but the reckless driver jumped a curb and took off again. Officer Saline eventually caught up with the fleeing vehicle when it reached a roadblock.

Doyle then noted that because many police departments and other law enforcement agencies throughout the country (including police departments in Connecticut and Virginia as well as the FBI) authorize use of shatterballs, his use of a shatterball did not violate "practices generally

---

[43] The Synopsis refers to two separate incidents that occurred in the Bronx. As set forth *infra*, the NYPD later clarified that its RFC determination was based only on an alleged "improper force tactic."

followed in the profession, current teaching at public safety training facilities, and technical reports and literature relevant to the field of law enforcement" (which is the regulatory definition of "gross misconduct").[44] Doyle also pointed out that under the NYPD Disciplinary Matrix, mere "penalty days" are warranted for an officer's use of an object not authorized by the NYPD. Thus, Doyle concluded, he should not be decertified (let alone disqualified) for committing a mere policy violation that would not have resulted in his termination had he been a tenured NYPD officer.

155. Doyle urged Russell to expedite his § 6056.7 request, noting that the Ulster County Sheriff's Office had expressed a strong willingness to consider him for a deputy sheriff position.

156. On September 14, 2026, Doyle asked Russell for an update on his § 6056.7 request, noting that he had missed numerous opportunities for employment with police departments while his request remained unresolved. On September 16, 2026, Russell responded, "We are still waiting on documentation from the NYPD. We will advise in writing on[ce] our review is complete."

157. On September 17, 2026, Doyle asked Russell if the NYPD had submitted anything. Russell responded by sending Doyle a September 15, 2026, letter from the NYPD to the DCJS Commissioner. In the letter, the NYPD stated as follows:

> Former Police Officer Doyle separated from the NYPD effective February 6, 2026, when he was subject to a disciplinary termination by order of the Police Commissioner while he was in probationary status.… Doyle had internal Charges and Specifications preferred against him alleging that he wrongfully used an unauthorized object, known as a "Shatter Ball" without permission or authority to do so. The above internal charges resulted from a vehicle pursuit during which … Doyle admitted that he threw a glass-shattering device called a "shatter ball" at the moving vehicle to shatter a window.
>
> The potential discipline for the above Charges and Specifications, depending on whether mitigating or aggravating factors were found to exist by our Office of Deputy Commissioner for Trials, can be found at

[44] Apparently, the NYPD does not officially authorize police officers to use a shatterball. However, on information and belief, the NYPD allows officers to use objects that are not officially authorized, such as a car safety hammer.

https://nypdonline.org/link/1024. Pursuant to the Department's Disciplinary Matrix, as a result of Police Officer Doyle's above actions he was subject to termination while in probationary status.

158. On October 8, 2026, Doyle asked Russell for an update. On October 13, 2026, Russell responded, "This matter is still being reviewed."

159. Doyle remains decertified and disqualified. He has not heard from the DCJS since Russell's October 13th email.

*Nerys Ramirez (born in 1983)*

160. Plaintiff Nerys Ramirez was appointed as an NYPD police officer on July 11, 2005, and was issued her police officer certificate some months later.

161. On May 16, 2025, the NYPD fired Ramirez for misconduct that she had committed while she was off police duty in plainclothes, had nothing to do with her official duties, and that had stemmed from an alcohol issue that she developed due to tragic events.

162. On May 27, 2026, Ramirez learned that the NYPD had reported her to the DCJS as a "removal for cause."

163. In an email sent to Defendant Stephanie Russell on May 28, 2026, Ramirez (through undersigned counsel) inquired about the status of her police officer certification.

164. Two weeks later, Russell sent Ramirez a letter from Defendant Kelly Conlon that was allegedly mailed out to Ramirez in August 2025.[45] In the letter, Conlon stated that Ramirez had been decertified and disqualified because "on August 6, 2025, the NYPD reported [her] … as

[45] Ramirez never received the letter allegedly mailed out to her by the DCJS.

a removal for cause pursuant to section 9 NYCRR Part 6056.2(h)(2)(a)(ii)[46] effective May 16, 2025."

165. Russell also sent Ramirez a document reflecting that the NYPD had reported her as follows:

| **Removal for Cause Type** | **Separation Reasons and Details** | **Synopsis** |
|---|---|---|
| Delete - Removal for Cause - 9 NYCRR § 6056.2(h)(2)(a)(ii): pursuant to a collective bargaining agreement, or any general, special or local law, or charter provision in accordance with Civil Service Law §76 | Gross Misconduct pursuant to 9 NYCRR §6056.2(h)(1)(f) | R was arrested for DWI. R refused breathalyzer. R was unfit for duty and impeded an investigation.<br><br>R was unfit for duty. R was arrested for failing to comply with a lawful order by another LEO. R failed to notify operations.[47] |

166. In an email sent to Russell on June 15, 2026, Ramirez acknowledged that the NYPD's "synopsis" was accurate but noted that there were compelling circumstances that mitigated her misconduct and that she had provided exceptional police service for almost two decades. However, Russell responded that the DCJS "would not be able to consider re-certifying" Ramirez insofar as her misconduct satisfied the regulatory definition of "gross misconduct."

167. Ramirez remains decertified and disqualified.

*Jack Nazaire (born in 1984)*

168. Plaintiff Jack Nazaire joined the NYPD as a traffic enforcement agent in 2013. He was appointed as an NYPD police officer on October 7, 2019, and was issued his police officer certificate some months later.

---

46 However, Ramirez was separated from the NYPD pursuant to "a hearing held under section 75 of the Civil Service Law." See 9 NYCRR § 6056.2(h)(2)(a)(i).

47 One of the incidents referenced in the Synopsis occurred in Manhattan; the other incident occurred in New Jersey.

169. On January 22, 2024, Nazaire resigned from the NYPD to seek a law enforcement job with another employer.

170. In a letter dated May 15, 2024, Defendant David Mahany informed Nazaire that he had been decertified and disqualified because "on May 13, 2024, the [NYPD] reported [him] … as a removal for cause pursuant to section 9 NYCRR Part 6056.2(h)(2)(a)(ii) effective January 22, 2024."[48]

171. In an email sent to Mahany on May 21, 2024, Nazaire (through undersigned counsel) asked for the NYPD's reporting data. On May 24, 2024, Defendant Kelly Conlon emailed Nazaire a document reflecting that the NYPD had reported him as follows:

| **Removal for Cause Type** | **Separation Reasons and Details** | **Synopsis** |
|---|---|---|
| Delete - Removal for Cause - 9 NYCRR §6056.2(h)(2)(a)(ii): pursuant to a collective bargaining agreement, or any general, special or local law, or charter provision in accordance with Civil Service Law §76 | Gross Misconduct pursuant to 9 NYCRR §6056.2(h)(1)(f) | Wrongfully used and possessed a controlled substance, marijuana[49] |

172. Conlon also told Nazaire that (a) the "purpose of [Mahany's May 15th letter] was to notify him of the change in his certification status"; and (b) "based on the NYPD report, the law prohibits him from any future police certification in NYS."

[48] As previously mentioned, § 6056.2(h)(2)(a)(ii) provides that "interruption from service includes separation pursuant to a collective bargaining agreement, or any general, special or local law, or charter provision in accordance with section 76 of the Civil Service Law." However, Nazaire's separation from the NYPD was a resignation.

[49] The NYPD's reporting data did not indicate that Nazaire's alleged use of "marijuana and/or cannabinoids" fell outside activity protected by the MRTA.

173. In a § 6056.7 request sent to Mahany on June 20, 2024, Nazaire initially noted that he had resigned from the NYPD when there were pending against him disciplinary charges alleging that in April 2023, he had "wrongfully" possessed and ingested "marijuana and/or cannabinoids without police or medical necessity." Nazaire explained, however, that his alleged misconduct did not satisfy § 6056.2(h)(1)(f)'s definition of "gross misconduct." Nazaire also pointed out that because the DCJS allows marijuana users to work as police officers (*see* 9 NYCRR § 6000.10(a)(1)(ii), (a)(2)(i)), it made no sense that his alleged marijuana use resulted in his decertification—let alone his permanent disqualification from his chosen profession.

174. On June 25, 2024, Mahany emailed Nazaire, "We are currently reaching out to NYPD to confirm that Mr. Nazaire was correctly reported as a removal for cause."

175. In an email sent to Mahany on August 6, 2024, Nazaire asked for an update. The next day, Mahany responded that (a) the DCJS had "not received the requested documents from the NYPD to commence our review under 9 NYCRR § 6056.7," and (b) his director was "attempting to get a response from another bureau within the NYPD."

176. On August 27, 2024, Nazaire emailed Mahany the following:

> Nazaire has been intending on applying for another police job in [this state], but this matter is holding up his applications. Can the DCJS decide this matter now without a response from the NYPD? Mr. Nazaire's submission was made over two months ago; his submission makes quite clear that the NYPD incorrectly reported him as a "removal for cause"; and it appears that the NYPD still hasn't responded to any of the DCJS's correspondence.

177. On August 30, 2024, Mahany emailed Nazaire the following:

> We recently had a conference call with NYPD to discuss [your matter]. It is my understanding that they are currently working on submitting a letter with documentation that supports why Mr. Nazaire's resignation met the definition of a removal for cause. I will reach out to my NYPD contact today to inquire on the status so that we can move forward with the 9 NYCRR 6056.7 review.

178. On October 17, 2024, Defendant Stephanie Russell told Nazaire the following:

> [The DCJS] was notified by the [NYPD] on October 10, 2024, that your separation from service should be amended from a removal for cause to a voluntary resignation pursuant to 9 NYCRR Part 6056.4(d)(2). Consequently, your record on the … Registry … has been updated to reflect a standard removal (not a removal for cause) and your certification is hereby validated for future police employment.

*Carl Delouis and Victor Guzman*

*Carl Delouis (born in 1988)*

179. Before starting his career in law enforcement, Plaintiff Carl Delouis served as a field radio operator in the United States Marines for several years. He received over a half-dozen military awards (including a Navy Unit Commendation and a Marine Corps Good Conduct Medal), and was honorably discharged.

180. Delouis was appointed as an NYPD police officer on December 29, 2021, and was issued his police officer certificate some months later.

181. On February 27, 2026, Delouis resigned from the NYPD.

182. In a letter dated June 1, 2026, Defendant Stephanie Russell informed Delouis that he had been decertified and disqualified because "on May 22, 2026, the NYPD reported [him] … as a removal for cause pursuant to section 9 NYCRR Part 6056.2(i) effective February 27, 2026."[50]

183. On July 7, 2026, Delouis (through undersigned counsel) asked Russell for the NYPD's reporting data. The next day, Russell sent Delouis a document reflecting that the NYPD had reported him as follows:

| Removal for Cause Type | Separation Reasons and Details | Synopsis |
|---|---|---|
| Delete - Removal for Cause - 9 NYCRR § 6056.2(i): removal | Gross Misconduct pursuant to 9 NYCRR §6056.2(h)(1)(f) | Dole failure. R wrongfully possessed and ingested marijuana.[51] |

[50] As previously mentioned, § 6056.2(i) provides that "removal during a probationary period means a probationary period not successfully completed due to [mis]conduct." However, Delouis was not on probation when he resigned from the NYPD.

| | | |
|---|---|---|
| during a probationary period means a probationary period not successfully completed due to conduct defined in 9 NYCRR § 6056.2(h)(1) | | |

184. On July 9, 2026, Delouis submitted a § 6056.7 request to Russell. While Delouis acknowledged that he had resigned from the NYPD when there were pending against him disciplinary charges alleging that he had "wrongfully" possessed and ingested "marijuana and/or cannabinoids," he denied ever using marijuana. Moreover, Delouis pointed out that his alleged misconduct did not satisfy the regulatory definition of "gross misconduct" and, in fact, constituted protected activity. Delouis also noted that the DCJS had no basis to treat him differently from Plaintiff Jack Nazaire.

*Victor Guzman (born in 1993)*

185. Plaintiff Victor Guzman was appointed as an NYPD police officer on July 5, 2017, and was issued his police officer certificate some months later.

186. On November 13, 2025, Guzman resigned from the NYPD.

187. On June 25, 2026, Guzman learned that he was listed on the DCJS's Decertification List. He also received for the first time (pursuant to a FOIL request made by undersigned counsel) a letter from Defendant Stephanie Russell, dated March 4, 2026, stating that he was "not eligible for an equivalency police certification or any future police certification" because "on February 17, 2026, the NYPD reported [him] … as a removal for cause pursuant to section 9 NYCRR Part 6056.2(h)(2)(b) effective November 13, 2025."

---

[51] The NYPD's reporting data did not indicate that Delouis's alleged use of "marijuana and/or cannabinoids" constituted unprotected activity.

188. On July 2, 2026, Guzman (through undersigned counsel) asked Russell for the NYPD's reporting data. Russell then sent Guzman a document reflecting that the NYPD had reported him as follows:

| **Removal for Cause Type** | **Separation Reasons and Details** | **Synopsis** |
|---|---|---|
| Delete - Removal for Cause - 9 NYCRR § 6056.2(h)(2)(b): an employee's resignation or retirement | Gross Misconduct pursuant to 9 NYCRR §6056.2(h)(1)(f) | Dole failure. R wrongfully possessed and ingested marijuana.[52] |

189. On July 9, 2026, Guzman submitted a § 6056.7 request to Russell. Guzman acknowledged that (a) he had resigned from the NYPD when there were pending against him disciplinary charges alleging that he had "wrongfully" possessed and ingested "marijuana and/or cannabinoids; and (b) in early September 2025, while off duty at his home, he ingested a few THC gummies. Guzman pointed out, however, that his use of THC did not constitute "gross misconduct." Guzman also noted that his THC use constituted protected activity. Finally, Guzman reminded Russell about what happened with Nazaire.

190. On September 21, 2026 (which was three weeks after this lawsuit was filed), Russell emailed Delouis and Guzman letters that were issued by the NYPD to the DCJS on August 26, 2026. In the letters, the NYPD stated that (a) the charges that were lodged against Delouis and Guzman were based upon their "failure of a random drug test," and (b) "the potential discipline for the above Charges and Specifications, depending on whether mitigating or aggravating factors were found to exist by our Office of Deputy Commissioner for Trials, can be found [in the NYPD Disciplinary Matrix]."

[52] The NYPD's reporting data did not indicate that Guzman's alleged use of "marijuana and/or cannabinoids" constituted unprotected activity.

191. In an email sent to Russell and Hoffman on September 22, 2026, Delouis and Guzman noted that (1) nothing from the NYPD's letters indicated that either of them had engaged in unprotected activity; and (2) the DCJS's own hiring standards provide that a police officer applicant's lawful use of marijuana does not render him unfit to serve as a police officer.

192. In an email sent to Russell and Hoffman on September 28, 2026, Delouis and Guzman noted that they had identified officers who were appropriately not decertified/disqualified for allegedly engaging in activity protected by the MRTA.

193. On October 5, 2026, Delouis and Guzman asked for an update from Russell and Hoffman. Russell responded, "We are discussing the matter internally with our Office of Legal Services. We will contact you once we have an update to provide."

194. Delouis and Guzman remain decertified and disqualified. They have not heard from the DCJS since Russell's October 5th email.

*Richard Delahanty (born in 1993)*

195. Plaintiff Richard Delahanty served in the United States Army Reserve from October 2011 to October 2019, when he received an honorable discharge. While in the Army, he (a) served primarily as a human intelligence collector; (b) was on active duty for nine months; (c) received several Army awards, including the Army Reserve Components Achievement Medal; (d) obtained a degree in intelligence operations studies from Cochise College and a degree in forensic psychology from John Jay College; (e) served as an intern for the United States Secret Service; and (f) began his career in law enforcement by joining the NYPD.

196. Delahanty was appointed as an NYPD police officer on July 13, 2016, and received his police officer certificate some months later. While in the NYPD's Academy, he achieved the highest firearms proficiency average in his recruit class.

197. On August 25, 2024, Delahanty retired from the NYPD to take a job in the private sector.

198. During his eight years on the NYPD force, Delahanty consistently received positive performance evaluations and was awarded 3 meritorious police duty medals as well as 14 excellent police duty medals.

199. In April 2026, Delahanty learned that he was listed on the Decertification List.

200. In an email sent to Defendant Russell on May 18, 2026, Delahanty (through undersigned counsel) noted that he never got decertification notice. Russell responded by sending Delahanty a letter that was allegedly mailed out to him on November 13, 2024. In the letter, Defendant Kelly Conlon stated that Delahanty had been decertified and disqualified because "on November 6, 2024, the [NYPD] reported [him] … as a removal for cause pursuant to section 9 NYCRR Part 6056.2(h)(2)(b) effective August 26, 2024."

201. In a § 6056.7 request submitted to Russell on May 18, 2026, Delahanty noted that an allegation of misconduct that was pending against him when he retired from the NYPD related

to a non-removable offense.[53] He also asked for all records in the DCJS's possession regarding his decertification.

202. Ten days later, Russell sent Delahanty a document reflecting that the NYPD had reported him as follows:

| **Removal for Cause Type** | **Separation Reasons and Details** | **Synopsis** |
|---|---|---|
| Delete - Removal for Cause - 9 NYCRR §6056.2(h): an employee's resignation or retirement | Gross Negligence pursuant to 9 NYCRR §6056.2(h)(1)(e) | Arrested for Reckless Endangerment 2, R discharged his firearm at a moving vehicle without justification.[54] |

203. On September 14, 2026 (after this lawsuit commenced, and four months after Delahanty submitted his § 6056.7 request), Russell asked Delahanty if there was "any supporting documentation [he] would like to provide related to this matter."

204. In an email sent to Russell and Hoffman on September 16, 2026, Delahanty noted that (a) the NYPD's disciplinary charge was that he had discharged a firearm in contravention of "PG 221-01, Page 3, Para 1(f)," which advises NYPD police officers not to discharge their firearms "at or from a moving vehicle unless deadly physical force is being used against the member of the

[53] One day in early 2021, in the Bronx, Delahanty discharged his firearm at a moving vehicle that was being used as an instrument of deadly force. No one was injured from the shooting, but Delahanty was hit by the moving vehicle and sustained multiple physical injuries. Delahanty was arrested on a second-degree reckless endangerment charge, but the criminal case resulted only in a conviction for the non-criminal offense of disorderly conduct. In mid-March 2022, the NYPD initiated a disciplinary action against Delahanty, charging him with violating an NYPD policy that prohibits an officer from shooting at "a moving vehicle unless deadly physical force is being used against the member of the service or another person present, by means other than a moving vehicle."

[54] The NYPD Disciplinary Matrix provides that for a "Firearm Discharge at or from a Moving Vehicle, Outside Department Guidelines not Resulting in Serious Physical Injury," the "presumptive penalty" is "20 penalty days" and the "aggravated penalty" is "30 penalty days + dismissal probation." (NYPD Disciplinary Matrix at 41). However, the Matrix does not set forth the presumptive or aggravated penalties for wrongful discharge of a firearm at a moving vehicle not resulting in any physical injury.

service or another person present, by means other than a moving vehicle"; and (b) under the NYPD Disciplinary Matrix, the presumptive penalty for his infraction was mere "penalty days." Delahanty also noted that his retirement was not "in connection with" the NYPD's disciplinary charge. And regarding whether Delahanty's infraction constituted "a gross deviation from the standard of care that a reasonable police or peace officer would observe in a similar circumstance" (which is Part 6056's definition of "gross negligence"), he pointed out that in various situations, many employers of police and other law enforcement officers permit or do not prohibit officers from shooting at a moving vehicle that itself constitutes deadly physical force. Finally, Delahanty asked to be provided with any and all materials that had been or will be submitted by the NYPD.

205. On September 22, 2026, Delahanty asked Russell if the NYPD had submitted anything in connection with him.

206. Russell responded by sending Delahanty a letter that was issued by the NYPD to the DCJS on June 29, 2026. In the letter, the NYPD stated the following:

> Former Police Officer Delahanty separated from the NYPD effective August 26, 2024, pursuant to a Vested Interest Retirement. On April 7, 2022, formal Charges and Specifications were served on … Delahanty after he was found to have discharged his firearm outside of Department guidelines, to wit, at a fleeing vehicle. Based upon this incident, our administrative records reveal that … Delahanty was also arrested for violating NYS Penal Law Section 120.20, Reckless Endangerment in the Second Degree, a Class A misdemeanor. The charges were still pending on the date of his separation from service. The presumptive penalty for conduct constituting a misdemeanor included forfeiture of thirty (30) penalty days with the penalty for aggravated circumstances being termination, in compliance with the NYPD Disciplinary Matrix …. Here, the offense of reckless endangerment constitutes an aggravating factor as it has been classified and upheld by courts as being a violation of an officer's Oath of Office under NYS Public Officers Law Section 30(1)(e).

207. Delahanty then informed Russell and Hoffman that the NYPD's point was moot, noting that the arrest charge had been dismissed approximately a year before his retirement date. Delahanty also pointed out that there was no evidence indicating that his "misconduct" rose to the

level of second-degree reckless endangerment or that his retirement was "in connection with" the disciplinary charge.

208. Delahanty remains decertified and disqualified. He has not heard from the DCJS since September 23, 2026, when Russell acknowledged receipt of one of his September 22nd emails.

*Keven Sanchez (born in 1997)*

209. Plaintiff Keven Sanchez was appointed as an NYPD police officer on July 13, 2022, and received his police officer certificate some months later.

210. On June 22, 2023, while Sanchez was still on entry-level probation at the NYPD's Police Academy, the NYPD summarily fired him without any specific explanation.

211. In a letter issued on September 28, 2023, Defendant Stephanie Russell informed Sanchez that he had been decertified and disqualified because "on September 6, 2023, the [NYPD] reported [him] … as a removal for cause pursuant to section 9 NYCRR Part 6056.2(h)(2)(a)(iii) effective June 22, 2023."

212. On June 18, 2026, Sanchez (through undersigned counsel) asked Russell for the NYPD's reporting data. On June 23, 2026, Russell responded by sending Sanchez a document reflecting that the NYPD had reported him as follows:

| **Removal for Cause Type** | **Separation Reasons and Details** | **Synopsis** |
|---|---|---|
| Delete - Removal for Cause - 9 NYCRR § 6056.2(h)(2)(a)(iii): pursuant to any other applicable law | Gross Negligence pursuant to 9 NYCRR §6056.2(h)(1)(e) | Dispute with another recruit in the Academy on Duty |

213. In a § 6056.7 request emailed to Russell on June 26, 2026, Sanchez noted that the NYPD's allegation that he had a "dispute" with a fellow recruit did not establish that he had committed "gross negligence."

214. In an email sent to Russell on July 6, 2026, Sanchez noted that he was actively seeking another police officer job and thus requested that his § 6056.7 request be expedited. The next day, Russell acknowledged receipt of Sanchez's request to expedite but said that she had no "timeframe to provide."

215. On September 22, 2026, Sanchez asked Russell if she had any update regarding his § 6056.7 request and if the NYPD had submitted anything. Later that day, Russell emailed Sanchez a September 8, 2026, letter in which the NYPD informed the DCJS of the following:

> Former Police Officer Sanchez separated from the NYPD effective June 22, 2023, when he was subject to a disciplinary termination by order of the Police Commissioner while he was in probationary status. The Executive Officer of the Police Academy recommended that … Sanchez'[s] employment be terminated based upon his performance and disciplinary record while undergoing his mandated training for certification. Based upon this recommendation, the Probationary Discipline Board of the Risk Mitigation Division met, reviewed the performance and disciplinary history of the member of service and unanimously recommended his termination to the Police Commissioner.
>
> This determination was based on … Sanchez being issued five (5) Deportment Cards for minor violations during his training: failure to submit homework or submitting incomplete homework, leaving his locker unsecured, failure to have his necessary gym equipment available, sleeping on duty and failing to follow Recruit Operations Assignment. Additionally, he was issued two (2) Command Disciplines: one for punctuality and one for failing to maintain professional conduct, a violation of the Recruit Officer Handbook.
>
> The latter was issued after he admitted that he splashed water on another Probationary Police Officer, an incident which the Probationary Police Officer reported because the event happened in the restroom and he did not know if he was splashed with water or urine.… Sanchez refused to acknowledge any wrongdoing and disregarded the instruction of his Instructor to calm himself. Upon the issuance of two Command Disciplines while training in the Police Academy, … Sanchez was automatically placed on Special Tracking. Additionally, [his] Instructor advised that he was a constant disciplinary problem in his recruit company and needed constant re-instruction and supervision. Based upon the above, his termination was recommended on the basis that he lacks the character, maturity, judgment and professional integrity expected of a Police Officer, unanimously approved by the Probationary Discipline Board of the Risk Management Division and ordered by the Police Commissioner.

> Based upon the totality of the circumstances, Police Officer Sanchez was subject to termination for violating his probation by engaging in a pattern of conduct unbecoming of a New York City Police Officer.

216. In an email sent to Russell on September 23, 2026, Sanchez urged her to limit the § 6056.7 review to the information set forth in the NYPD's RFC report and to disregard the new factual allegations and theory of misconduct set forth in the NYPD's September 8th letter.

217. Sanchez remains decertified and disqualified. He has not heard from the DCJS since Russell's September 22, 2026, email.

*Danny Quintanal (born in 1985)*

218. In November 2018, Plaintiff Danny Quintanal began employment with Riverbay Corporation, which operates a housing development called Co-op City.

219. After Quintanal was issued a peace officer certificate in early 2019 and was appointed by the NYPD Commissioner as a special patrolman in early 2020, he started serving as a special patrolman for Co-op City's Department of Public Safety.

220. On April 4, 2024, Riverbay Corporation summarily fired Quintanal without any explanation.

221. On or about July 1, 2026, Quintanal learned that he was listed on the Decertification List.

222. On October 9, 2026, Quintanal (through undersigned counsel) asked Defendants Stephanie Russell and Stephanie Hoffman for all records in the DCJS's possession regarding him.

223. On October 14, 2026, Hoffman emailed Quintanal two documents. The first one reflected that the Co-Op City Department of Public Safety reported Quintanal as follows:

| Removal for Cause Type | Separation Reason |
|---|---|
| Delete - Removal for Cause - 9 NYCRR §6056.2(h)(2)(a)(ii): pursuant to a collective bargaining agreement, or any general, special or local law, or charter provision in accordance with Civil Service Law §76 | dishonesty pursuant to 9 nycrr §6056.2(h)(1)(b)[55] |

224. The other document provided by Hoffman was an April 8, 2024, letter from Defendant David Mahany to Riverbay. In the letter, Mahany noted to Riverbay that on April 4, 2024, "you report[ed]" that Quintanal "ceases to serve your department due to incompetence or misconduct pursuant to section 9 NYCRR Part 6056.2(h)(2)(a)(ii)."

225. In an email sent to Russell and Hoffman on October 16, 2026, Quintanal inquired about whether decertification notice was ever sent to him. On October 23, 2026, Hoffman responded, "Our records reflect no letter was sent to Mr. Quintanal."

226. In an email to Russell and Hoffman on October 23, 2026, Quintanal denied Riverbay's allegation of "dishonesty" and noted that he intends to seek another peace officer job.

227. On October 26, 2026, Quintanal asked Russell and Hoffman to commence a § 6056.7 review.

228. Quintanal remains decertified. He has not heard from the DCJS since October 27, 2026, when Russell acknowledged receipt of his § 6056.7 request.

## JURISDICTION AND VENUE

229. This action arises under the Fourteenth Amendment and 42 U.S.C. § 1983.

230. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4).

---

[55] The alleged "dishonesty" apparently occurred at Riverbay.

231. Venue in the Southern District of New York ("SDNY") is appropriate under 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to the claims occurred here. In particular, and among other things: (a) all actions the NYPD took in connection with Plaintiffs' separations from employment, including issuing termination notices, submitting RFC reports, and communicating with the DCJS, occurred at the NYPD headquarters; (b) of the ten police officer Plaintiffs, seven of them (Betanco, Delahanty, Doyle, Garcia, Guzman, Nazaire, and Ramirez) were at all relevant times assigned to NYPD precincts in the SDNY;[56] and (c) of the ten police officer Plaintiffs, six of them (Betanco, Delahanty, Doyle, Garcia, Guzman, and Ramirez) had home mailing addresses in the SDNY on file with both the DCJS and the NYPD.[57]

## CLASS ACTION ALLEGATIONS

232. Plaintiffs bring this action, under Federal Rules of Civil Procedure 23(a) and 23(b)(2)–(3), on behalf of the following "Class":

> All persons who, from the beginning of the applicable limitations period through the date of judgment or until the scheme at issue ceases, have been or will be decertified as a police or peace officer by the DCJS.

233. The "Police Officers Subclass" consists of all Class members who have been or will be disqualified from serving as a police officer.[58]

234. The classes are so numerous that joinder is impracticable. Over 3,700 officers are listed on the DCJS's Decertification List. Since around January 2023, approximately 650 police

---

[56] Regarding the other three police officer Plaintiffs, Gao and Delouis were assigned to precincts in the Eastern District of New York ("EDNY") and Sanchez was a recruit at the NYPD Police Academy in the EDNY.

[57] The mailing addresses on file with both the DCJS and the NYPD for the other police officer Plaintiffs (Gao, Sanchez, Delouis, and Nazaire) were in the EDNY.

[58] Subject to additional information obtained through discovery and further investigation, the above-described classes may be modified or narrowed as appropriate.

officers and 1,130 peace officers have been decertified by and/or received decertification notice from the DCJS.

235. Legal or factual questions common to the Class members that predominate over individualized issues include (a) whether Defendants categorically decertify a police/peace officer based on an employer's reporting that an officer's separation from employment constituted a "removal for cause"; (b) whether Defendants' § 6056.7 review is limited to whether an employer's allegations reflect that an officer was "removed for cause"; (c) whether Defendants violate due process by decertifying a police/peace officer based on an employer's RFC report; (d) whether Defendants violate due process by decertifying a police/peace officer without notice or an opportunity to be heard; (e) whether Defendants violate due process by disqualifying a police officer from future police certification based on an employer's RFC report and without notice or an opportunity to be heard; and (f) whether Defendants are liable for compensatory and punitive damages.

236. Plaintiffs' claims are typical of the claims of the other Class members, because all of them were or are at risk of being similarly affected by Defendants' unconstitutional scheme.

237. Plaintiffs will fairly and adequately protect and represent the interests of all Class members. Plaintiffs' interests are consistent with those of the other Class members. Counsel for Plaintiffs know of no material conflict of interest among the Class members.

238. Defendants have acted or refused to act on grounds that apply generally to the classes, making classwide relief appropriate.

239. Class action treatment is a superior method for the fair and efficient adjudication of the claims asserted by all Class members. Such treatment will permit countless similarly situated individuals to prosecute their common claims in a single forum simultaneously, efficiently, and

without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. Plaintiffs know of no difficulty that could arise from the management of this litigation that would preclude its maintenance as a class action.

240. Counsel for Plaintiffs have identified and thoroughly investigated all claims in this action, have vast experience litigating cases on behalf of law enforcement officers, have extensive knowledge of the applicable laws, and have committed sufficient resources to represent the classes through trial and any appeals.

## CAUSES OF ACTION

### Count One
### Fourteenth Amendment Due Process - Deprivation of Professional Certification
### On Behalf of the Class

241. Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

242. The Fourteenth Amendment prohibits state officials from depriving a person of "property" without "due process of law."

243. Because police and peace officer certificates can be suspended or revoked only when the holder is "removed for cause," an officer's interest in the certification is a property interest protected by the Due Process Clause.

244. Defendants have deprived and/or will deprive the Class members of that interest without procedural or substantive due process by, inter alia:

(a) Suspending and/or revoking police and peace officer certificates based on their former employer's reports that their separation from employment satisfied the regulatory definition of "removal for cause," even when the reporting does not indicate that the alleged "misconduct" is true or reflect on the officer's fitness to serve;

(b) Suspending and/or revoking police and peace officer certificates without advance notice or an opportunity to be heard;

(c) Failing to provide adequate notice of decertification and, in some cases, providing no notice at all;

(d) Conducting proceedings under 9 NYCRR § 6056.7 in an ex parte manner;

(e) Failing to resolve § 6056.7 requests promptly; and

(f) Limiting post-deprivation review to whether the circumstances reported by the former employer satisfy the regulatory definition of "removal for cause," even when the officer disputes the underlying allegation of "misconduct" or establishes that the alleged "misconduct" has no bearing on the officer's fitness to serve.

245. As a direct and proximate result of these due process violations, the Class members have suffered and/or will suffer economic loss, reputational harm, emotional distress, and other damages.

**Count Two**
**Fourteenth Amendment Due Process - Exclusion from the Policing Profession**
**On Behalf of the Police Officers Subclass**

246. Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

247. The Fourteenth Amendment prohibits state officials from depriving a person of "liberty" without "due process of law."

248. The right to pursue a chosen profession is a liberty interest protected by the Due Process Clause.

249. Defendants have deprived and/or will deprive the members of the Police Officers Subclass of that interest without procedural or substantive due process by, inter alia:

(a) Permanently disqualifying police officers from their chosen profession based on their former employer's reports that their separation from employment satisfied the regulatory definition of "removal for cause," even when the reporting does not indicate that the alleged "misconduct" is true or reflect on the officer's fitness to serve;

(b) Disqualifying police officers without advance notice or an opportunity to be heard;

(c) Failing to provide adequate notice of disqualification and, in some cases, providing no notice at all;

(d) Conducting § 6056.7 proceedings in an ex parte manner;

(e) Failing to resolve § 6056.7 requests promptly; and

(f) Limiting post-deprivation review to whether the circumstances reported by the former employer satisfy the regulatory definition of "removal for cause," even when the officers dispute the underlying allegation of "misconduct" or establishes that the alleged conduct has no bearing on the officer's fitness to serve.

250. As a direct and proximate result of these due process violations, the Police Officers Subclass members have suffered and/or will suffer economic loss, reputational harm, emotional distress, and other damages.

**Count Three**
**Fourteenth Amendment Due Process - Void for Vagueness**
**On Behalf of the Class**

251. Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

252. The definition of "removal for cause" in 9 NYCRR § 6056.2(h) fails to provide fair notice of what conduct or circumstances may lead to decertification or disqualification. Section 6056.2(h)'s definition of "removal for cause" also permits employers and Defendants to classify materially similar employment separations differently.

253. Defendants violate due process by applying that definition to decertify police/peace officers and to disqualify police officers from the policing profession.

254. As a direct and proximate result of these due process violations, the Class members have suffered and/or will suffer economic loss, reputational harm, emotional distress, and other damages.

**<u>Count Four</u>**
**Fourteenth Amendment Due Process - Stigma-Plus**
**On Behalf of the Class**

255. Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

256. Defendants identify Class Members as "removals for cause" on the public Decertification List and keep them on the List for life. These designations falsely convey that (a) officers who remain fit to serve are currently unfit for law enforcement, and (b) officers engaged in wrongdoing, even when they did not commit the alleged "misconduct" or committed conduct protected by state law.

257. In connection with publishing those designations, Defendants invalidate the officers' certificates and, for police officers, disqualify them from future police certification. The publication of materially false and stigmatizing designations, coupled with those state-imposed deprivations, implicates the Class members' protected liberty interest in their "good name, reputation, honor, and integrity."

258. Defendants have deprived and/or will continue to deprive the Class members of that protected interest by placing them and keeping them on the Decertification List without, inter alia:

(a) providing advance notice or an opportunity to be heard;

(b) providing adequate notice of the factual basis for the designation; or

(c) providing a meaningful opportunity to contest the underlying allegations, rebut the implication of current unfitness, and clear their names.

259. As a direct and proximate result of these due process violations, the Class members have suffered and/or will suffer economic loss, reputational harm, emotional distress, and other damages.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

A. Certify this action as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(2)–(3); appoint Plaintiffs as representatives of the Class; appoint Plaintiffs other than Danny Quintanal as representatives of the Police Officers Subclass; and appoint Plaintiffs' counsel as counsel for the classes;

B. Declare that Defendants' decertification/disqualification scheme, including GML § 209-q(1)(b)–(c), CPL § 2.30(6), and 9 NYCRR § 6056.2(h), violates due process;

C. Enjoin Defendants from operating any decertification/disqualification scheme that does not comport with due process;

D. Order Defendants to (i) recertify all Class members who remain or become decertified under the challenged scheme, with their certificates valid for the applicable periods specified in GML § 209-q(1)(b) and CPL § 2.30(6) beginning on the recertification date; (ii) restore eligibility for future police certification to all Police Officers Subclass members who remain or become disqualified under the challenged scheme; (iii) update the Decertification List and the Registry of Police Officers and Peace Officers to reflect the relief granted; and (iv) provide the updated information to all persons and entities that received or relied upon the affected records;

E. Award the Class members compensatory, punitive, and other damages in amounts to be determined at trial;[59]

F. Award the Class members the costs and expenses incurred in the investigation and prosecution of this action, including reasonable attorneys' fees; and

G. Grant such other relief that may be deemed just and proper.

---

[59] Plaintiffs assert their claims for prospective declaratory and injunctive relief against Defendants in their official capacities and their claims for damages against Defendants in their individual capacities.

Dated: November 3, 2026

Respectfully submitted,

/s/ Stuart Gold
Stuart Gold
Michael Martinez
Stuart London
MARTINEZ & LONDON, LLP
111 John Street, Suite 640
New York, NY 10038
(212) 964-8038
SGold@mlpbalaw.com
MMartinez@mlpbalaw.com
SLondon@mlpbalaw.com

*Attorneys for Plaintiffs*